## LASSEN, COMMISSIONER, STATE LAND DEPARTMENT v. ARIZONA ex rel. ARIZONA HIGHWAY DEPARTMENT.

No. 84. Argued November 16, 1966.—Decided January 10, 1967.

*John P. Frank* argued the cause for petitioner. With him on the briefs were *Darrell F. Smith,* Attorney General of Arizona, by *Dale R. Shumway* and *Dix W. Price.*

*Rex E. Lee* argued the cause for respondent. With him on the brief were *Darrell F. Smith,* Attorney General of Arizona, by *John T. Amey,* Assistant Attorney General, and *J. A. Riggins, Jr.*

*Assistant Attorney General Weisl,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Marshall* and *Richard A. Posner.*

*John J. O'Connell,* Attorney General, and *Harold T. Hartinger,* Assistant Attorney General, filed a brief for the State of Washington, as *amicus curiae,* urging reversal.

*John J. O'Connell,* Attorney General of Washington, and *John R. Miller,* Assistant Attorney General, filed a brief for the Washington Parks and Recreation Commission, as *amicus curiae,* urging affirmance.

MR. JUSTICE HARLAN delivered the opinion of the Court.

This action was brought as an original proceeding in the Supreme Court of Arizona by the State on the relation of its Highway Department. The Department seeks to prohibit the application by the State Land Commissioner of rules governing the acquisition of rights of way and material sites in federally donated lands held in trust by the State.[1] The Commissioner's rules provide in pertinent part that "Rights of Way and Material Sites may be

---

[1] This action is in form and substance a controversy between two agencies of the State of Arizona, both formally represented by the State's Attorney General. We have nonetheless concluded that this is a case with which we may properly deal. The Land Commissioner is apparently a substantially independent state officer, appointed for a term of years and removable only for cause. He is essentially the trustee of the trust at issue here, with custody of the trust lands. In addition, both the Commissioner and the Highway Department are represented by special counsel appointed by the Attorney General to advocate the divergent positions of the parties.

granted . . . for an indefinite period . . . after full payment of the appraised value . . . has been made to the State Land Department. The appraised value . . . shall be determined in accordance with the principles established in A. R. S. 12–1122." Rule 12. The Supreme Court of Arizona held that it may be conclusively presumed that highways constructed across trust lands always enhance the value of the remaining trust lands in amounts at least equal to the value of the areas taken. It therefore ordered the Commissioner to grant without actual compensation material sites and rights of way upon trust lands. 99 Ariz. 161, 407 P. 2d 747.

The lands at issue here are among some 10,790,000 acres granted by the United States to Arizona in trust for the use and benefit of designated public activities within the State.[2] The Federal Government since the Northwest Ordinance of 1787 has made such grants to States newly admitted to the Union.[3] Although the terms of these grants differ, at least the most recent commonly make clear that the United States has a continuing interest in the administration of both the lands and the funds which derive from them. The grant involved here thus expressly requires the Attorney General of the United

---

[2] The grants consisted of four sections in each township for the support of common schools, plus specified acreages for other designated purposes. The other acreages were granted for the support of agricultural and mechanical colleges, a school of mines, military institutes, the payment of bonds, miners' hospitals, penitentiaries, and similar purposes. Of the 10,790,000 acres granted to Arizona for all designated uses, some 9,180,000 acres were earmarked for various educational purposes, of which some 8,000,000 acres were given for the support of common schools.

[3] Between 1803 and 1962, the United States granted a total of some 330,000,000 acres to the States for all purposes. Of these, some 78,000,000 acres were given in support of common schools. The Public Lands, Senate Committee on Interior and Insular Affairs, 88th Cong., 1st Sess., 60 (Comm. Print 1963).

States to maintain whatever proceedings may be necessary to enforce its terms.[4] We brought this case here because of the importance of the issues presented both to the United States and to the States which have received such lands.[5] 384 U. S. 926.

The issues here stem chiefly from ambiguities in the grant itself. The terms under which the United States provided these lands were included in the New Mexico-Arizona Enabling Act. 36 Stat. 557. The Act describes with particularity the disposition Arizona may make of the lands and of the funds derived from them, but it does not directly refer to the conditions or consequences of the use by the State itself of the trust lands for purposes not designated in the grant. Of the issues which may arise from the Act's silence, we need now reach only two: first, whether Arizona is permitted to obtain trust lands for such uses without first satisfying the Act's restrictions on disposition of the land; and second, what standard of compensation Arizona must employ to recompense the trust for the land it uses. Both issues require consideration of the Act's language and history.

I.

We turn first to the question of the method by which Arizona may obtain trust lands for purposes not included in the grant. The constraints imposed by the Act upon the methods by which trust lands may be transferred are few and simple. Section 28, which is reproduced in the Appendix to this opinion, requires, with exceptions inapplicable here, that lands be sold or

[4] 36 Stat. 575.

[5] Nine States urged as *amici curiae* that we review the judgment below. One of the nine, New Mexico, received lands in trust under the very grant in issue here. The Supreme Court of New Mexico has held in closely similar circumstances that actual compensation must be paid to the trust. *State* v. *Walker,* 61 N. M. 374, 301 P. 2d 317.

leased only to "the highest and best bidder at a public auction to be held at the county seat of the county wherein the lands . . . shall lie . . . ." The section prescribes the terms, form and frequency of the notice which must be given of the auction. It requires that no lands be sold for a price less than their appraised value. The Act imposes two sanctions upon transactions which fail to satisfy its requirements. First, § 28 provides broadly that trust lands must be "disposed of in whole or in part only in manner as herein provided . . . ." It adds that "Disposition of any of said lands . . . in any manner contrary to the provisions of this Act, shall be deemed a breach of trust." Finally, it provides that "Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed . . . not made in substantial conformity with the provisions of this Act shall be null and void . . . ."

The parties urge, and the state court assumed, that Arizona need not follow these procedures when it seeks material sites and rights of way upon trust lands.[6] The Commissioner's rules thus do not require an auction or other public sale. This view has been taken by other state courts construing similar grants. *Ross* v. *Trustees of University of Wyoming*, 30 Wyo. 433; 222 P. 3, *State* v. *Walker*, 61 N. M. 374, 301 P. 2d 317. We have concluded, for the reasons which follow, that the restrictions of the Act are inapplicable to acquisitions by the State for its highway program.

The Act's silence obliges us to examine its purposes, as evidenced by its terms and its legislative history, to de-

---

[6] In addition, the court suggested that the restrictions of the Enabling Act are inapplicable here because the State obtains less than a fee interest. This contention is plainly foreclosed by the language of § 28, by which "Every sale, lease, conveyance, or contract of or concerning any of the lands" is void unless in substantial conformity with the Act.

termine whether these restrictions should be imposed here. The grant was plainly expected to produce a fund, accumulated by sale and use of the trust lands, with which the State could support the public institutions designated by the Act. It was not supposed that Arizona would retain all the lands given it for actual use by the beneficiaries; the lands were obviously too extensive and too often inappropriate for the selected purposes. Congress could scarcely have expected, for example, that many of the 8,000,000 acres of its grant "for the support of the common schools," all chosen without regard to topography or school needs, would be employed as building sites.[7] It intended instead that Arizona would use the general powers of sale and lease given it by the Act to accumulate funds with which it could support its schools.

The central problem which confronted the Act's draftsmen was therefore to devise constraints which would assure that the trust received in full fair compensation for trust lands. The method of transfer and the transferee were material only so far as necessary to assure that the trust sought and obtained appropriate compensation. This is confirmed by the legislative history of the Enabling Act. All the restrictions on the use and disposition of the trust lands, including those on the powers of sale and lease, were first inserted by the Senate Committee on the Territories.[8] Senator Beveridge, the committee's chairman, made clear on the floor

---

[7] The school lands were granted according to the rigid checkerboard pattern of the federal survey. Four sections per township were granted by number for the support of common schools, instead of the one section per township ordinarily given in the earlier grants, because the unappropriated lands in Arizona and New Mexico were largely of so little value. Orfield, Federal Land Grants to the States 45.

[8] S. Rep. No. 454, 61st Cong., 2d Sess., 18.

464

of the Senate that the committee's determination to require the restrictions sprang from its fear that the trust would be exploited for private advantage. He emphasized that the committee was influenced chiefly by the repeated violations of a similar grant made to New Mexico in 1898.[9] The violations had there allegedly consisted of private sales at unreasonably low prices, and the committee evidently hoped to prevent such depredations here by requiring public notice and sale.[10] The restrictions were thus intended to guarantee, by preventing particular abuses through the prohibition of specific practices, that the trust received appropriate compensation for trust lands. We see no need to read the Act to impose these restrictions on transfers in which the abuses they were intended to prevent are not likely to occur, and in which the trust may in another and more effective fashion be assured full compensation.

Further, we should not fail to recognize that, were we to require Arizona to follow precisely these procedures, we would sanction an empty formality. There would not often be others to bid for the material sites and rights of way which the State might seek. More important, even if such bidders appeared and proved successful, nothing in the grant would prevent Arizona from thereafter condemning the land which it had failed to purchase; the anticipation of condemnation would leave the auction without any real significance. We cannot see that the trust would materially benefit from this circuity.

---

[9] Remarks of Senator Beveridge, 45 Cong. Rec. 8227.

[10] *Ibid.* These violations culminated in a series of lawsuits brought by the Department of Justice against those privy to them. These lawsuits were pending when the Enabling Act was under study by Congress. The importance of this episode is also indicated in the committee's report. S. Rep. No. 454, 61st Cong., 2d Sess., 19–20.

We conclude that it is consonant with the Act's essential purposes to exclude from the restrictions in question the transactions at issue here. The trust will be protected, and its purposes entirely satisfied, if the State is required to provide full compensation for the land it uses. We hold, therefore, that Arizona need not offer public notice or conduct a public sale when it seeks trust lands for its highway program. The State may instead employ the procedures established by the Commissioner's rules, or any other procedures reasonably calculated to assure the integrity of the trust and to prevent misapplication of its lands and funds.

## II.

The second issue here is the standard of compensation which Arizona must employ to recompense the trust for the land it acquires. The Land Commissioner's rules provide simply that the State must pay the appraised value, as measured by the State's condemnation statute, of the right of way or material site. The Highway Department urges, and the Arizona Supreme Court held, that nothing need ever be actually paid since it may be conclusively presumed that all highways enhance the value of the remaining trust lands in amounts at least equal to the value of the lands which were taken. The United States, as *amicus curiae*, suggests that the Highway Department be obliged to pay the land's appraised value, but that it be permitted to reduce that sum by the amount of any enhancement shown in the value of the remaining trust lands. The rule urged by the United States differs from that adopted by the state court only in that the United States would not permit the Highway Department to presume enhancement, but would instead require that it be established by the Department in each instance with reasonable certainty and precision. Under this rule, enhancement would have to be individually

proved and computed for small tracts of land checkered over the entire State.

We are urged by the United States to determine only the validity of the rule of law stated by the Arizona Supreme Court, and to defer the broader question of whether enhancement may ever be permitted to diminish the actual compensation payable to the trust. The United States emphasizes that the broader issue does not directly arise under the Commissioner's rules, since the Arizona condemnation statute incorporated by those rules does not permit benefits to reduce the compensation payable for the condemned land's fair market value.[11] We are unable to take so narrow a view. The rule adopted by the state court clearly stemmed from, and depended upon, the premise that enhancement may be balanced against the value of the trust lands taken by the State. If we severed the conclusion from its premise, we would halt short of a full adjudication of the validity of the Commissioner's rules, and unnecessarily prolong the litigation of this important question. We have therefore reached the broader issue, and have concluded that the terms and purposes of the grant do not permit Arizona to diminish the actual compensation, meaning thereby monetary compensation, payable to the trust by the amount of any enhancement in the value of the remaining trust lands.

The Enabling Act unequivocally demands both that the trust receive the full value of any lands transferred from it and that any funds received be employed only for the purposes for which the land was given. First, it requires that before trust lands or their products are offered for sale they must be "appraised at their true value,"

---

[11] Ariz. Rev. Stat. Ann. § 12–1122. The statute permits benefits to reduce any damages caused by severance to the uncondemned portions of a parcel of land, but not to reduce the compensation paid for the land which is condemned.

and that "no sale or other disposal . . . shall be made for a consideration less than the value so ascertained . . . ." [12] The Act originally provided in addition that trust lands should not be sold for a price less than a statutory minimum.[13] Second, it imposes a series of careful restrictions upon the use of trust funds. As this Court has noted, the Act contains "a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose." *Ervien* v. *United States,* 251 U. S. 41, 47. The Act thus specifically forbids the use of "money or thing of value directly or indirectly derived" [14] from trust lands for any purposes other than those for which that parcel of land was granted. It requires the creation of separate trust accounts for each of the designated beneficiaries, prohibits the transfer of funds among the accounts, and directs with great precision their administration. "Words more clearly designed . . . to create definite and specific trusts and to make them in all respects separate and independent of each other could hardly have been chosen." *United States* v. *Ervien,* 246 F. 277, 279. All these restrictions in combination indicate Congress' concern both that the grants provide the most substantial support possible to the beneficiaries and that only those beneficiaries profit from the trust.

This is confirmed by the background and legislative history of the Enabling Act. The restrictions placed upon land grants to the States became steadily more rigid and specific in the 50 years prior to this Act, as Congress

---

[12] 36 Stat. 574.

[13] *Ibid.* The Act fixed a minimum price of $3 per acre in Arizona. This requirement was removed by the Act of June 5, 1936. 49 Stat. 1477. The Act still requires that land "susceptible of irrigation" under federal or other projects not be sold for less than $25 per acre. 36 Stat. 574.

[14] 36 Stat. 574.

sought to require prudent management and thereby to preserve the usefulness of the grants for their intended purposes.[15] The Senate Committee on the Territories, with the assistance of the Department of Justice,[16] adopted for the New Mexico-Arizona Act the most satisfactory of the restrictions contained in the earlier grants. Its premise was that the grants cannot "be too carefully safeguarded for the purpose for which they are appropriated."[17] Senator Beveridge described the restrictions as "quite the most important item" in the Enabling Act, and emphasized that his committee believed that "we were giving the lands to the States for specific purposes, and that restrictions should be thrown about it which would assure its being used for those purposes."[18]

Nothing in these restrictions is explicitly addressed to acquisitions by the State for its other public activities; the Enabling Act is, as we have noted, entirely silent on these questions. We must nevertheless conclude that the purposes of Congress require that the Act's designated beneficiaries "derive the full benefit"[19] of the grant. The conclusive presumption of enhancement which the Arizona Supreme Court found does not in our view adequately assure fulfillment of that purpose, particularly in the context of lands that are as variegated and farflung as those comprised in this grant. And we think that the more particularized showing of enhancement advocated by the United States, resting as it largely would upon the forecasts of experts which by nature

---

[15] Orfield, Federal Land Grants to the States 48–52.

[16] S. Rep. No. 454, 61st Cong., 2d Sess., 20.

[17] Ibid.

[18] Remarks of Senator Beveridge, 45 Cong. Rec. 8227.

[19] Letter from former Secretary of the Interior Garfield to the House Committee on the Territories. H. R. Rep. No. 152, 61st Cong., 2d Sess., 3.

are subject to the imponderables and hazards of the future, also falls short of assuring accomplishment of the basic intendment of Congress. Acceptance of either of these courses for reimbursing the trust in these circumstances might well result in diminishing the benefits conferred by Congress and in effect deflecting a portion of them to the State's highway program.[20]

We hold therefore that Arizona must actually compensate the trust in money [21] for the full appraised value of any material sites or rights of way which it obtains on or over trust lands.[22] This standard most nearly reproduces the results of the auction prescribed by the

---

[20] Despite widespread use of the value of benefits in computing condemnation awards, the various rules adopted for that purpose have created confusion and difficulties. See Haar & Hering, The Determination of Benefits in Land Acquisition, 51 Calif. L. Rev. 833. These problems would be aggravated in the context of this situation, since the benefits would have to be individually computed for tracts of land scattered over the entire State.

[21] We do not mean to suggest that deferred payment arrangements might not be appropriate. Cf. the provisions of § 28 (see Appendix): "no sale or other disposal thereof shall be made for a consideration less than the value so ascertained, nor upon credit unless accompanied by ample security, and the legal title shall not be deemed to have passed until the consideration shall have been paid." Nor do we mean that exchanges, in the situations in which they are permitted by the Act, would not be appropriate. Cf. the provisions of § 28 (see Appendix): "The State of Arizona is authorized to exchange any lands owned by it for other lands, public or private, under such regulations as the legislature thereof may prescribe: Provided, That such exchanges involving public lands may be made only as authorized by Acts of Congress and regulations thereunder."

[22] We are informed by counsel that over a period of years Arizona has obtained the use of large areas of trust lands on bases that may not have accorded with those set forth in this opinion. We wish to make it plain that we do not reach either the validity of any such transfers or the obligations of the State, if any, with respect thereto.

Act, and most consistently reflects the essential purposes of the grant.

The judgment of the Supreme Court of Arizona is accordingly reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT.

### SECTION 28 OF NEW MEXICO-ARIZONA ENABLING ACT, AS AMENDED.

Sec. 28. That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the said State, shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, shall be deemed a breach of trust.

No mortgage or other encumbrance of the said lands, or any part thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever. Said lands shall not be sold or leased, in whole or in part,.except to the highest and best bidder at a public auction to be held at the county seat of the county wherein the lands to be affected, or the major portion thereof, shall lie, notice of which public auction shall first have

been duly given by advertisement, which shall set forth the nature, time, and place of the transaction to be had, with a full description of the lands to be offered, and be published once each week for not less than ten successive weeks in a newspaper of general circulation published regularly at the State capital, and in that newspaper of like circulation which shall then be regularly published nearest to the location of the lands so offered; nor shall any sale or contract for the sale of any timber or other natural product of such lands be made, save at the place, in the manner, and after the notice by publication provided for sales and leases of the lands themselves. Nothing herein contained shall prevent: (1) the leasing of any of the lands referred to in this section, in such manner as the Legislature of the State of Arizona may prescribe, for grazing, agricultural, commercial, and homesite purposes, for a term of ten years or less; (2) the leasing of any of said lands, in such manner as the Legislature of the State of Arizona may prescribe, whether or not also leased for grazing and agricultural purposes, for mineral purposes, other than for the exploration, development, and production of oil, gas, and other hydrocarbon substances, for a term of twenty years or less; (3) the leasing of any said lands, whether or not also leased for other purposes, for the exploration, development, and production of oil, gas and other hydrocarbon substances on, in, or under said lands for an initial term of twenty years or less and as long thereafter as oil, gas, or other hydrocarbon substance may be procured therefrom in paying quantities, the leases to be made in any manner, with or without advertisement, bidding, or appraisement, and under such terms and provisions as the Legislature of the State of Arizona may prescribe, the terms and provisions to include a reservation of a royalty to said State of not less than 12½ per centum of production; or (4) the Legislature of the State of Arizona from providing by proper laws for the

protection of lessees of said lands, whereby such lessees shall be protected in their rights to their improvements (including water rights) in such manner that in case of lease or sale of said lands to other parties the former lessee shall be paid by the succeeding lessee or purchaser the value of such improvements and rights placed thereon by such lessee.

All lands, leaseholds, timber, and other products of land, before being offered, shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained, nor upon credit unless accompanied by ample security, and the legal title shall not be deemed to have passed until the consideration shall have been paid.

No lands shall be sold for less than their appraised value, and no lands which are or shall be susceptible of irrigation under any projects now or hereafter completed or adopted by the United States under legislation for the reclamation of lands, or under any other project for the reclamation of lands, shall be sold at less than twenty-five dollars per acre: *Provided,* That said State, at the request of the Secretary of the Interior, shall from time to time relinquish such of its lands to the United States as at any time are needed for irrigation works in connection with any such government project. And other lands in lieu thereof are hereby granted to said State, to be selected from lands of the character named and in the manner prescribed in section twenty-four of this Act.

The State of Arizona is authorized to exchange any lands owned by it for other lands, public or private, under such regulations as the legislature thereof may prescribe: *Provided,* That such exchanges involving public lands may be made only as authorized by Acts of Congress and regulations thereunder.

There is hereby reserved to the United States and excepted from the operation of any and all grants made or

confirmed by this Act to said proposed State all land actually or prospectively valuable for the development of water power or power for hydro-electric use or transmission and which shall be ascertained and designated by the Secretary of the Interior within five years after the proclamation of the President declaring the admission of the State; and no lands so reserved and excepted shall be subject to any disposition whatsoever by said State, and any conveyance or transfer of such land by said State or any officer thereof shall be absolutely null and void within the period above named; and in lieu of the land so reserved to the United States and excepted from the operation of any of said grants there be, and is hereby, granted to the proposed State an equal quantity of land to be selected from land of the character named and in the manner prescribed in section twenty-four of this Act.

A separate fund shall be established for each of the several objects for which the said grants are hereby made or confirmed, and whenever any moneys shall be in any manner derived from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys was by this Act conveyed or confirmed. No moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed. The state treasurer shall keep all such moneys invested in safe, interest-bearing securities, which securities shall be approved by the governor and secretary of state of said proposed State, and shall at all times be under a good and sufficient bond or bonds conditioned for the faithful performance of his duties in regard thereto, as defined by this Act and the laws of the State not in conflict herewith.

474

Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this Act shall be null and void, any provision of the constitution or laws of the said State to the contrary notwithstanding.

It shall be the duty of the Attorney-General of the United States to prosecute, in the name of the United States and in its courts, such proceedings at law or in equity as may from time to time be necessary and appropriate to enforce the provisions hereof relative to the application and disposition of the said lands and the products thereof and the funds derived therefrom.

Nothing herein contained shall be taken as in limitation of the power of the State or of any citizen thereof to enforce the provisions of this Act.