662 P.2d 221

The STATE of Idaho, on relation of Marjorie Ruth MOON, State Treasurer of the State of Idaho, Plaintiff-Respondent, Cross-Appellant,

v.

STATE BOARD OF EXAMINERS, and the Legislature of the State of Idaho, By and Through Thomas W. Stivers, Speaker of the House, and James E. Risch, President Pro-Tem of the Senate, Defendants-Appellants, Cross-Respondents.

No. 14070.

Supreme Court of Idaho.

March 24, 1983.

Rehearing Denied May 10, 1983.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Steven M. Parry, Deputy Atty. Gen., Boise, for defendants-appellants, cross-respondents.

Wayne P. Fuller, Sp. Asst. Atty. Gen., Caldwell, for plaintiff-respondent, cross-appellant.

HUNTLEY, Justice.

The Idaho Constitution mandates that losses suffered by the Public School Endowment Fund (the "Fund") be reimbursed by legislative appropriation. Article 9, § 3 states:

> "Public school fund to remain intact.—The public school fund of the state shall forever remain inviolate and intact; the interest thereon only shall be expended in the maintenance of the schools of the state, and shall be distributed among the several counties and school districts of the state in such manner as may be prescribed by law. No part of this fund, principal or interest, shall ever be transferred to any other fund, or used or appropriated except as herein provided. The state treasurer shall be the custodian of this fund, and the same shall be securely and profitably invested as may be by law directed. The state shall supply all losses thereof that may in any manner occur."

By this appeal we are asked to determine whether the legislative implementation of an accounting procedure for computing the extent of capital losses, if any, through the accounting method set forth in I.C. § 57–724, passes constitutional muster [1].

---

1. I.C. § 57–724. "Distribution of income from investments—Determination of net capital gains or losses.—The board shall distribute the income from the investments or securities in accordance with this act. For the purposes of this act, income shall not include capital gains derived from the sale of investments or securities. In computing net capital gains or net capital losses the board shall use the marketable value of the securities as of the effective date hereof [March 25, 1969] for its computation on July 1, 1971, and shall thereafter use the difference between acquisition cost of securities and actual proceeds received from the

The Fund is managed and invested by the Endowment Fund Investment Board which invests a portion of the funds in authorized corporate stocks, bonds, and debentures.

This action was originally filed in the U.S. District Court for the State of Idaho. The District Court's dismissal of the complaint upon the abstention doctrine was affirmed by the Ninth Circuit Court of Appeals. Thereafter plaintiff filed her complaint in state district court, challenging the offset procedure dictated by I.C. § 57–724. The complaint was dismissed without prejudice by the district court on April 30, 1979, for lack of a justiciable controversy. In dismissing the complaint, the district court stated: "If the legislature fails or declines to execute its duties by accomplishing the purpose and intent of I.C. § 57–724, following July 1, 1979, then the plaintiff may renew her action."

The endowment fund investment board issued copies of its audit report and financial statements to each member of the legislature on January 4, 1980. The audit report indicated that there had been a $1,359,000 gain to the public school fund, and thus there were no losses to be made up. The auditors, for purposes of ascertaining whether there was a gain or loss to the fund, used the procedure provided in I.C. § 57–724. The treasurer asserts that if proper and constitutional accounting methods were used, there are losses to be made up of $7,009,385.60 principal and $6,431,-593.72 interest.

Following adjournment of the 1980 session of the legislature, respondent filed a supplemental complaint seeking an order requiring the board of examiners to allow the claims and requiring the legislature to reimburse the fund. The state board of examiners and the legislature filed a motion to dismiss, asserting that they had complied with the court's earlier order and that the complaint failed to state a claim. The district court denied appellants' motion to dismiss, granted a partial summary judgment to the respondent, denied appellants' motion to reconsider and this appeal followed.

The specific issue on appeal is whether, as contended by the Treasurer and held by the trial court, the loss on each individual security trade must be reimbursed, or whether it is constitutionally proper, as per I.C. § 57–724, and as contended by the Board and the appellants, to offset capital gains against capital losses to determine whether there has been either a net loss or a net gain during the four-year accounting period.

Article 9, § 3 of the Idaho Constitution requiring the legislature to supply all losses to the Fund is not self-executing—rather it requires implementing legislation. In *Moon v. Investment Board,* 96 Idaho 140, 143, 525 P.2d 335, 337 (1974), we stated:

"Implementation of constitutional principles is an appropriate function of legislation, and unless such implementing legislation is clearly in violation of the constitutional principle, it is a valid exercise of the legislative power . . . ."

The question becomes, is the method of computing losses as contained in I.C. § 57–724 in violation of a constitutional provision? We hold that it is not and reverse the judgment of the district court.

The public school endowment fund is a trust, the principal of which is derived primarily from the sale or lease of lands designated exclusively for school purposes. Idaho's admission to the federal Union was conditioned upon the creation of a permanent school fund. Idaho accepted this condition of admission to the union by enacting

sale of securities as the determinate of the gain or loss. Gains or losses shall be determined for four (4) year periods, commencing on July 1, 1975. At the end of each such four (4) year period, the net amount of losses on the sale of securities, not offset by gains on the sale of securities during such period shall be computed and such net losses shall be made up from an appropriation from the general fund, and shall be credited to the appropriate fund. All net income or net losses from the investments or securities shall be distributed to each participating fund in the same rates as each fund's average daily balance bears to the total average daily balance of all participating funds, provided, losses of the public school fund shall be maintained separate from all other funds as required by section 3 of article 9 of the Idaho Constitution."

Art. 9, § 3, of the Idaho Constitution. *Duchesne County v. State Tax Comm'n*, 104 Utah 365, 140 P.2d 335 (Utah 1943), held that an agreement whereby an Admission Act makes a gift to the State of certain government lands and makes the proceeds from the sale of such lands a permanent fund, the interest only of which is to be expended for support of common schools, and which gift is accepted by a reciprocal provision of the state constitution creating the states' school fund, amounts to the creation of an express trust of which the state is trustee and guarantor of the trust estate against loss.

The Fund is a trust of the most sacred and highest order. *See State v. Peterson*, 61 Idaho 50, 97 P.2d 603 (1939); I.C. § 57–715. In *United States v. Fenton*, 27 F.Supp. 816 (D.Idaho 1939), the court stated:

"The express purpose of the Admission Act and the State Constitution is to protect and hold inviolate and intact the fund from the Acts of the Legislature or acts or failures of the officers of the State." 27 F.Supp. at 818.

In *Moon v. Investment Board, supra*, we quoted from the proceedings and debates of the Idaho Constitutional Convention (1889), Vol. I, at 647, as instructive in ascertaining the intent of the Constitutional Convention in drafting article 9, § 3, as follows:

"Mr. McCONNELL: Mr. Chairman, I think no fund is more sacred than the school fund, and perhaps there is no other fund so sacred; it should be guarded in every manner possible, and by having this provision in here, the children will always be made sure there will be that much money to their credit, and we will have that much at stake in our schools. But if there is no provision for making this fund good in every way, it may be squandered, and the first thing we know our school fund will be so small that we can only maintain the schools by local taxation. I think the legislature can provide for making good any losses which may occur. They will probably be more careful in making investments if it is known that the state has to make it good."

We held that this indicated that the Constitutional Convention intended the legislative branch of the government should have control over the fund and as an incentive to making sound investments, the convention provided that the legislature would have to make good all losses. A logical and common sense reading of the method used to compute losses as codified in I.C. § 57–724 leads us to the conclusion that this method does not violate the constitutional mandate. To require the legislature to make up losses incurred on each security sale might well act to the detriment of the school children of Idaho. It would unduly restrict the Endowment Fund Investment Board.

For example, the Fund frequently holds bonds, which if held to maturity would yield a certain profit, but which if sold before maturity at a loss, and with the proceeds elsewhere reinvested, would yield a higher long range profit. This flexibility and opportunity for higher profit would likely not be exercised if the legislature would be forced to make up the loss of the sale of the bonds.

The result contended for by the treasurer would have us interpret the terms "capital gains" and "interest" as being synonymous. Noting that the constitution provides the "*interest* thereon only shall be expended in the maintenance of the schools . . . ," she argues that to offset capital gains and capital losses would be to in effect spend the gains other than for school purposes. However, the constitution does not specify how losses shall be computed. It does not define capital gains and interest as being synonymous terms and we decline to do so.

We have reviewed the decision in *State ex rel. Bottcher v. Bartling*, 149 Neb. 491, 31 N.W.2d 422 (1948), relied on by the district court and respondents. There is a significant difference in the wording of the Nebraska Constitution interpreted therein and the wording of the Idaho Constitution.

With regard to the public school fund, the Nebraska Constitution makes no distinction between interest income and capital gain, but simply provides that *all*

*"income* arising therefrom shall be faithfully applied to the specific objects of the original grants or appropriations. 31 N.W.2d at 426. [Emphasis added.]."

In contrast, the Idaho Constitution provides that the portion of income represented by interest is to be spent on the maintenance of the schools. The *Bartling* decision merely stands for the proposition that capital gains are income to a public school fund and is not germain to interpreting the effect of the very different language of the Idaho Constitution.

Accordingly, we hold that I.C. § 57–724, permitting the offsetting of capital gains against capital losses at the end of a four-year accounting period, is in keeping with the constitutional mandate of Art. 9, § 3, of the Idaho Constitution. Under I.C. § 57–724, the net capital gains at the end of each four-year period become part of principal and then become inviolate.

It is to be noted that the legislative duty to offset losses occasioned by a breach of trust, or other mechanisms not placed in issue by the appeal, are not addressed by this decision. The requirement of Art. 9, § 3, is that the Public School Endowment Fund be kept inviolate. The accounting procedure adopted by the legislature in I.C. § 57–724 satisfies that mandate.

The judgment is reversed.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur.

BISTLINE, Justice, dissenting.

If I correctly understand the Court's resolution of the very narrow issue presented, it is that the Court, overwhelmed with the State's responsibility to recompense the public school endowment fund for over $13,-000,000 in losses, has arrived at a decision based on policy rather than constitutional law. As a preface to this dissent, it is important to note that it is not this Court's role to amend the Constitution or to uphold legislative enactments which have that same effect. If the Idaho Constitution is to be amended, the legislature alone can initiate an amendment in accordance with Idaho Constitution, article 20, section 1:

"Any amendment ... to this Constitution may be proposed in either branch of the legislature, and if the same shall be agreed to by two-thirds (⅔) of all the members of each of the two (2) houses, ... such proposed amendment ... [shall be submitted] to the electors of the state at the next general election ... and if a majority of the electors shall ratify the same, such amendment ... shall become a part of this Constitution."

The experience recently gained at the last (1982) general election suggests that the legislature could reasonably expect favorable voter reaction to a proposed amendment. The legislature, however, has not gone that route, and I submit that it is not for this Court, the members of which are sworn to uphold our Constitution, to condone legislation beyond the pale of the Constitution—even though the thing sought to be accomplished would undoubtedly appear attractive to private enterprise dealing in its own finances.

Upon its admission into the Union, Idaho was granted by the United States land sections numbered 16 and 36 in every township in the state or sections in lieu thereof "for the support of common schoos." 26 Stat.L. 215, ch. 656 § 4 (Idaho Admission Act). The Idaho Admission Act required that "all lands herein granted for educational purposes shall be disposed of only at public sale, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools." 26 Stat.L. 215, ch. 656, § 5. The Idaho Admission Act declared that "the constitution which the people of Idaho have formed for themselves be, and the same is hereby accepted, ratified, and confirmed." 26 Stat.L. 215, ch. 656, § 1. The Idaho Constitution, which was at that time confirmed by Congress, contained the following provision regarding the public school fund established with the proceeds from the United States land grant:

"Public school fund to remain intact.— The public school fund of the state shall forever remain inviolate and intact; the

interest thereon only shall be expended in the maintenance of the schools of the state . . . . *No part of this fund,* principal or interest, *shall* ever be transferred to any other fund, or *used or appropriated except as herein provided.* The state treasurer shall be the custodian of this fund, and the same shall be securely and profitably invested as may be by law directed. The state shall supply all losses thereof that may *in any manner occur.*" Id. Const. art. 9, § 3 (emphasis added).

The money held in this public school endowment fund are not monies held by the State in its sovereign capacity but are held by the State only *in a trust capacity* for future generations of Idaho school children. The State's responsibility in administering this trust was recognized in *United States v. Fenton,* 27 F.Supp. 816 (D.Idaho 1939):

"[T]he State holds the Public School fund in trust under the conditions of a National Act and the Constitution of the State and not as its property. The Supreme Court of Oklahoma explains clearly this distinction in the case of *Board of Commissioners of Woods County v. State ex rel. Com'rs,* 125 Okl. 287, 257 P. 778, 779, 53 A.L.R. 1128, where it is said: 'There is a distinction between right accruing to the state in handling revenues belonging to it and the rights of the state arising from control of the common school fund, held in trust by the state. The revenues belonging to the state in its sovereign capacity are a part of its property, and so long as the state keeps within constitutional limitations it may deal with its property as it sees fit. On the other hand, the common school fund *does not belong to the state,* but the state merely holds such fund in trust under the conditions of the federal grant contained in the Enabling Act. The school funds were merely intrusted for the benefit of the common school, and the state pledged itself to hold such trust inviolate for the benefit of the schools. * * *' See *In re Loan of School Fund,* 18 Colo. 195, 32 P. 273.

"As both the Admission Act and the State Constitution grants in trust Public school lands, the proceeds from the sale thereof naturally remains as a part of the Trust, and that the conditions are inviolable conditions which were accepted by the State. The State cannot violate these conditions nor dissipate such funds . . . ." *Id.* at 819 (emphasis added).

These permanent school funds have long and consistently been regarded by the courts as trust funds of the highest and most sacred order. *United States v. Fenton, supra; Moon v. Investment Board,* 96 Idaho 140, 525 P.2d 335 (1974); *State v. Peterson,* 61 Idaho 50, 97 P.2d 603 (1939). I.C. § 57–715 similarly declares that "[p]ermanent endowment funds of the state of Idaho are hereby declared to be trust funds of the highest and most sacred order and shall be controlled, managed and invested . . . in accordance with the highest standard . . . ."

The legislature, however in 1969, enacted I.C. § 57–724, which purports to relax the trust responsibility established by the Idaho Constitution. That enactment in pertinent part provides:

"At the end of each such four (4) year period, the net amount of losses on the sale of securities, not offset by gains on the sale of securities during such period shall be computed and such net losses shall be made up from an appropriation from the general fund."

Although the Constitution provides that "[t]he state shall supply all losses [from the fund] that may in any manner occur," I.C. § 57–724 would nullify that with the provision that at the end of four-year intervals the state is only required to replace "such net losses on the sale of securities, *not offset by gains* . . . ." (Emphasis added.) The Constitution dictates otherwise, and directs that the state recompense the fund for all losses that may occur "in any manner."

The Court finds that since this constitutional provision is not self-executing, a premise which may be accepted *arguendo,* implementing legislation cannot violate the command of the Constitution. It is said today that I.C. § 57–724 provides a *reason-*

*able* means for carrying out the constitutional mandate. On today's money market, obviously not at all like that which existed at the turn of the nineteenth century, absent a Constitution, reasonableness is apparent. But article 3 of the Constitution simply does not endow the legislature with the right to determine for itself that a profit and loss statement may encompass a four-year period. The Constitution is clear and unequivocal that "[n]o part of this fund, principal or interest, shall *ever* be transferred ... or used or appropriated *except as herein provided.*" For certain, the legislature is without any authority—no matter how keenly its collective judgment is attuned to the recent money market—to set up a four-year period, a ten-year period, or any period wherein investment losses will be deducted from investment gains to arrive at the net losses it shall supply under the constitutional mandate.[1] The Constitution did not so contemplate. Instead, "[t]he state treasurer shall be the custodian of this fund, and the same shall be securely and profitably invested as may be by law directed." Undoubtedly, the framers were aware that in making investments there might be some losses, but, rather than providing for an offset against the gains as is the legislative proposition here at issue, they went on in the very next sentence to provide: "The state shall supply *all* losses thereof that may *in any manner* occur." (Emphasis added.)

The majority determines that the method for computing losses found in I.C. § 57–724 does not violate the constitutional provision requiring the State to reimburse the public school endowment fund for "all losses." However, the majority ignores that part of the Constitution which requires that "[n]o part of this fund, principal or interest, shall ever be transferred to any other fund, or used or appropriated except as herein provided." This provision prohibits the transfer, use, or appropriation of "capital gains" for any other purpose than is provided in the Constitution itself. The Constitution does not provide that capital gains may be used to offset capital losses. The majority, in another part of its analysis, finds that capital gains do not constitute "interest" and so do not have to be used solely for "the maintenance of the schools of the state." Even adopting, *arguendo,* the conclusion that capital gains do not constitute "interest", it still does not follow that capital gains do not constitute "principal" and so are similarly prohibited from being transferred or used or appropriated except as constitutionally provided. The Constitution divides the public endowment fund into two categories: "principal or interest." Whichever category capital gains fall into, principal or interest, the Constitution is clear: they may not be used or appropriated to offset capital losses.

The Court opts for what it sees as "a logical and common-sense" approach to constitutional construction. It declines to be persuaded by compelling precedent. The United States Supreme Court in *Lassen v. Arizona,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967), examined Congress' concern with permanent school endowment funds created by land grants to the states:

> "All these restrictions in combination indicate Congress' concern both that the grants provide the most substantial support possible to the beneficiaries and that only those beneficiaries profit from the trust.
>
> . . . .
>
> "[The] premise [involved] was that the grants cannot 'be too carefully safeguarded for the purpose for which they are appropriated.' Senator Beveridge described the restrictions as 'quite the most important item' in the Enabling Act, and emphasized that his committee believed that 'we were giving the lands to the States for specific purposes, and that restrictions should be thrown about it *which would assure* its being used for those purposes.' " 385 U.S. at 467–68, 87 S.Ct. at 589 (emphasis added) (footnote omitted).

F.Supp. 816, 818 (D.C.Idaho 1939).

---

1. "The expression 'forever remain inviolate and intact' would not mean ten or any number of years that may be enacted into a statute, but it means forever." *United States v. Fenton,* 27

Congress, in granting lands to the states, sought to *insure* the educational needs of future generations of children. Its premise "was that the grants cannot 'be too carefully safeguarded ....' " The Idaho Court, however, looks not to the aspect of safeguarding the permanent endowment fund, but finds succor in its own four-member rationale that "[t]o require the legislature to make up losses incurred on each security sale *might well* act to the detriment of the school children of Idaho," and "would *unduly restrict* the Board of Examiners." Concededly, as against investing in the private sector, the Constitution is restrictive. And so it was intended, and so it was worded. The Court would properly say, "so be it." If the legislature is not satisfied with the Constitution as written and ratified by the people, change can come through procedures which are within constitutional limitations.

The result opted for by today's Court flies in the face of precedent, obviously a matter given scant concern by the majority. As early as 1897, this Court in *State v. Fitzpatrick*, 5 Idaho 499, 51 P. 112 (1897), held that the usury laws did not apply to a loan of the public school endowment fund. The Court in so holding stated:

"The people, throughout the constitution, have thus declared for what purpose all interest on the permanent fund shall be applied. No part of it can be expended in the payment of forfeitures or penalties imposed by the statute law of the state. *Any law enacted by the legislature diverting one dollar of principal or interest of said fund to other purposes would be unconstitutional....* The constitution expressly prohibited the legislature from enacting a law that would divert one dollar of said funds otherwise than as provided by the constitution.

"In the face of those solemn provisions of the constitution, it is sought in this action to impose a forfeiture or penalty of $560 out of accrued interest earned by $2,000 of the permanent school fund, which interest, the constitution declares, must be distributed to the schools through out the state; and also to reduce

the permanent school fund $133.44, which fund, the constitution has declared, must be kept inviolate and intact. *The legislature cannot thus do indirectly what it is prohibited from doing directly." Id.* at 507, 51 P. at 114 (emphasis added).

The Court today does just that—it upholds a law which indirectly takes money from the permanent school fund by allowing the Board to offset losses which the State would otherwise have to supply from the general fund. In *Fitzpatrick,* the relief requested was merely for an offset of a $560 statutory usury penalty to be made from the $2,000 interest that was made on a usurious loan. The Court would not allow it. Such an offset should not be allowed today.

The language and reasoning used by the Court in Fitzpatrick was reaffirmed by this Court in *State v. Peterson,* 61 Idaho 50, 97 P.2d 603 (1939), wherein it was held that the statute of limitations did not bar an action to foreclose a mortgage given to secure a loan from the public school endowment fund. The Court there stated:

"Thus these public school endowment funds are trust funds of the highest and most sacred order, made so by Act of Congress and the Constitution, so considered by the members of the Constitutional Convention ... and so recognized and declared by this court." *Id.* at 53–54, 97 P.2d at 604.

The Court similarly fails to take note of this Court's recent decision in *Moon v. Investment Board,* 98 Idaho 200, 560 P.2d 871 (1977). In that case, the Investment Board had, pursuant to appropriations by the legislature, transferred $100,000 interest income earned by investment of public school endowment funds into the Investment Board Expense Fund to defray expenses of investing those assets by the Investment Board. The Court held this action unconstitutional:

"The sole issue presented by plaintiff's petition is whether or not the legislature may constitutionally appropriate and authorize a portion of the earnings from the

investment of the public school funds to be transferred to and used by the Investment Board Expense Fund to defray the expenses incurred by the Investment Board in the investment of the public school fund. It is our opinion that the legislation authorizing this practice and the practice itself, is in violation of Art. 9, § 3, of the Constitution of the State of Idaho." 98 Idaho at 202, 560 P.2d at 872 (citing *State v. Fitzpatrick*, 5 Idaho 499, 51 P. 112 (1897) among other cases). It is interesting to note that the Court in adopting this position was not then persuaded by the argument made by a dissenting justice:

"I find it hard to conceive that the drafters of the Constitution, while specifically providing that the corpus of the Public School Fund should remain 'inviolate' and requiring the makeup of all losses to said fund, also meant that the *gross* earnings from the investments are similarly 'inviolate' from any costs reasonably incurred in the investment process. I realize that the language of the Constitution:

'No part of this fund, principal or interest, shall ever be transferred to any other fund, or used or appropriated except as herein provided'

could be so construed, however, I do not believe that such a narrow construction of that clause is either necessary or desirable." *Id.* at 201, 560 P.2d at 872 (Shepard, J., dissenting) (emphasis in original).

The Court today again achieves an aurora of being consistently inconsistent, to the extent of once again breaking with precedent, and in this instance rewriting the Constitution. What may be even more interesting to note is that the dissent in the 1977 *Moon* case addressed the very issue with which the Court is faced today:

"Here there is no argument but that the monies so appropriated by the legislature were reasonably necessary to and represent the reasonable expenses incurred by the Board in its investment duties. There can be no argument that such legislation is merely a ruse to allow invasion

of the corpus of the school fund since *the Constitution also requires that any losses to that fund, occasioned by investment,* will be by the legislature made up to the Public School Fund. See *Moon v. Investment Board,* [96 Idaho 140, 525 P.2d 335]." *Id.* (Emphasis added.)

The Court attempts to distinguish this case from *Bottcher v. Bartling,* 149 Neb. 491, 31 N.W.2d 422 (Neb.1948), which Judge Walters found to be "virtually in point regarding the legitimacy of offsetting gains and losses from a permanent school fund," saying:

"We have reviewed the decision in *State ex rel. Bottcher v. Bartling* [149 Neb. 491], 31 N.W.2d 422 (1948), relied on by the district court and respondents. There is a significant difference in the wording of the Nebraska Constitution interpreted therein and the wording of the Idaho Constitution.

"With regard to the public school fund, the Nebraska Constitution makes no distinction between interest income and capital gain, but simply provides that *all* 'income arising therefrom shall be faithfully applied to the specific objects of the original grants or appropriations. 31 N.W.2d at 426. [Emphasis added.].' In contrast, the Idaho Constitution provides that the portion of income represented by interest is to be spent on the maintenance of the schools. The *Bartling* decision merely stands for the proposition that capital gains are income to a public school fund and is not germain to interpreting the effect of the very different language of the Idaho Constitution." Majority Opinion at 223–224.

Confessing my inability to understand and apply this analysis, I cannot argue against it. I do comprehend that which the *Bartling* court said:

"The particular complaint of the plaintiff is that the Legislature was without constitutional power to provide that in case of sales of bonds held in the various funds under the management and trusteeship of the Board of Educational Lands and Funds for more than the par

value of such bonds, the difference between the par value and the selling price should be set up as a capital reserve to offset past capital losses.

. . . .

"With a clear design to preserve and protect the grant of lands made by the United States to Nebraska for support of common schools and the benefits flowing therefrom, a provision was placed in the Constitution of 1866, which was the first state Constitution, in part as follows: 'The principal of all funds arising from the sale or other disposition of lands or other property granted or intrusted to this State, for educational and religious purposes, shall forever be preserved inviolate and undiminished; and the income arising therefrom shall be faithfully applied to the specific objects of the original grants or appropriations.' Const. 1866, art. VII, § 1.

. . . .

" 'All funds belonging to the state for educational purposes, the interest and income whereof only are to be used, shall be deemed trust funds held by the state, and the state shall supply all losses thereof, that may in any manner accrue, so that the same shall remain forever inviolate and undiminished; * * *.' Const. art. VII, § 9.

. . . .

"By the provision complained of the Legislature sought to relieve the State from its constitutional obligation to supply all losses to the perpetual school funds. We have not been cited to any precedents and we think there are none which would permit the Legislature in any such manner to override and render for naught the will of the people as expressed through the Constitution. It is fundamental that in case of a conflict between the Constitution and a legislative enactment the statute must give way to the Constitution. The Constitution is the paramount law. Where there is a conflict between an act of the Legislature and the Constitution of the State, the statute must yield to the extent of the repugnancy. [Citations omitted.]

"To permit that which the Legislature has attempted to authorize by the provision complained of would be to permit the State to be relieved of its obligation to restore losses to the perpetual school funds by a mere bookkeeping arrangement by the Board of Educational Lands and Funds over which funds the Legislature has no control and in which it and the State have no interest except in a supervisory capacity, and from which the State may not profit.

"The State under the provisions of the Acts of Congress and the Nebraska Constitution herein referred to may not claim benefits to itself for profits flowing to trust funds of which it is trustee and thus relieve it of its constitutional obligation as a state to keep inviolate such trust funds.

"The provision of the Act in question, if a valid exercise of legislative power, would permit the offset of losses occasioned by breach of trust against profits as well as losses not involving breach of trust. No different treatment is accorded the one than the other.

"Even in the absence of constitutional obligation upon the trustee to restore funds, as is true here, a trustee would not be permitted to offset losses occasioned by his breach of trust against profits and no valid statute could be enacted legalizing any such transaction.

"The rule in this connection is well stated in Restatement, Trusts, § 213(b), p. 595, as follows: 'If the trustee is liable for a loss occasioned by a breach of trust in respect of one portion of the trust property, he cannot reduce the amount of his liability by deducting the amount of gain which has accrued with respect to another part of the trust property through another and distinct transaction which is not a breach of trust.'

"This proposition is fundamental in the law of trusts and it would therefore be necessary, even in the absence of constitutional obligation of the State to supply the losses to the perpetual school funds, to say that the provision permitting off-

set of past losses against profits would not be a valid exercise of legislative power.

"A grant of specific power by the Legislature that is contrary to and out of harmony with the fundamental law is unconstitutional and void. *Scott v. Flowers* [61 Neb. 620, 85 N.W. 857], supra; *Tiernan v. Rinker,* 102 U.S. 123, 26 L.Ed. 103." 31 N.W.2d at 425–28.

Joining company with Judge Walters, I find the *Bartling* opinion well-reasoned and persuasive. Even without that case, however, my view is that the Court today could have readily, properly and wisely adopted the district court's opinion as its own.

As noted by the majority, this case was initially filed in the United States District Court for the State of Idaho. That court dismissed the complaint on the basis of federal court abstention. This dismissal was upheld on appeal to the Ninth Circuit. *State of Idaho v. State Board of Examiners,* 567 F.2d 858 (9th Cir.1978), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160. The Ninth Circuit found that the dismissal was warranted for the purpose of conserving judicial resources. However, the court in so holding did find that the case involved a substantial federal question:

"In this case, however, we have more than mere ratification of state-created rights. As the district court noted, this suit concerns conditions attached to the grant of public lands to the state of Idaho. Hence, a substantial federal question is presented, and the district court correctly found subject matter jurisdiction." *Id.* at 859.

I take solace in the fact that Ms. Moon may appeal today's decision to the federal courts and relitigate this "substantial federal question" to insure that the public school endowment fund does in fact "forever remain inviolate and intact." Id. Const. art. 9, § 3.