2003 WY 70

**William H. RIEDEL, Appellant (Plaintiff),**

v.

**Craig C. ANDERSON and Gail M. Anderson; Office of State Lands and Investments (formerly State Land and Farm Loan Office); Stephen Reynolds in his official capacity as director of the Office of State Lands and Investments; Board of Land Commissioners; and Governor David Freudenthal, Secretary of State Joe Meyer, Auditor Max Maxfield, Treasurer Cynthia Lummis and Superintendent of Public Instruction Trent Blankenship, in their official capacities as members of the Board of Land Commissioners, Appellees (Defendants),**

and

**Wyoming Stock Growers Association; Wyoming Wool Growers Association; and Wyoming Farm Bureau Federation, Appellees (Intervenor Defendants).**

**Wyoming Stock Growers Association, and Wyoming Wool Growers Association, Appellants (Intervenor Defendants),**

v.

**William H. Riedel, Appellee (Plaintiff),**

and

**Office of State Lands and Investments (formerly State Land and Farm Loan Office); Stephen Reynolds in his official capacity as director of the Office of State Lands and Investments; Board of Land Commissioners; and Governor David Freudenthal, Secretary of State Joe Meyer, Auditor Max Maxfield, Treasurer Cynthia Lummis and Superintendent of Public Instruction Trent Blankenship, in their official capacities as members of the Board of Land Commissioners, Appellees (Defendants).**

Nos. 02–60, 02–61.

Supreme Court of Wyoming.

June 4, 2003.

Steven F. Freudenthal of Freudenthal, Salzburg & Bonds, P.C., Cheyenne, Wyoming, Representing William H. Riedel.

Hoke MacMillan, Attorney General; Michael L. Hubbard, Deputy Attorney General; Nancy E. Vehr, Assistant Attorney General; John B. Speight and Amanda Hunkins of Speight, McCue & Associates, P.C., Cheyenne, Wyoming, Representing State of Wyoming. Argument by Ms. Vehr.

Karen Budd–Falen and Brandon L. Jensen of Budd–Falen Law Offices, P.C., Cheyenne, Wyoming, Representing Wyoming Farm Bureau Federation. Argument by Mr. Jensen.

Daniel B. Frank of Frank Law Office, Cheyenne, Wyoming; Kermit C. Brown of Brown & Hiser, LLC, Laramie, Wyoming, Representing Wyoming Stock Growers Association and Wyoming Wool Growers Association. Argument by Mr. Brown.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶1] In this appeal the Court is asked to decide the constitutionality of Wyo. Stat. Ann. § 36–5–105(a) and (e), governing the preferential leasing of school lands, and whether the state's school lands are encumbered by a trust and, if so, the nature of that trust. Before we examine these weighty issues, however, we must first address an issue of standing.

[¶2] As explained below, we hold that William H. Riedel has standing to challenge the constitutionality of the statute in question; that the school lands are subject to neither a federal trust nor a state constitutional trust, but rather to a legislatively-

created statutory trust; and that William H. Riedel has failed to prove that the preferential-right-to-renew statute violates any constitutional or fiduciary restraints on the State's management of the school lands.

## ISSUES

[¶ 3] The parties have filed a total of eight briefs in this matter, in their appellant and appellee capacities, containing approximately twenty-four different formulations of the issues on appeal. Consolidating those various formulations, the appeals raise the following issues for this Court's determination:

1. Whether Riedel has standing to challenge the constitutionality of Wyo. Stat. Ann. § 36–5–105(a) and (e) governing the leasing of school lands.

2. Whether the Wyoming Act of Admission, 26 Stat. 222, Ch. 664 (July 10, 1890), the Wyoming Constitution, or Wyoming statutes establish a trust with respect to the lands which the United States gave to Wyoming for the support of the common schools.

3. If the state school lands are in fact held in trust, whether the statutory right of a previous lessee to renew a lease of state school lands violates the State's management duties with respect to those lands.

## FACTS

[¶ 4] Craig C. and Gail M. Anderson held an agricultural lease to approximately 640 acres of state-owned land in Laramie County. The leased land is Section 36 of Township 16 North, Range 63 West of the 6th P.M., and as such is part of the land granted to the State by Congress "for the support of the common schools" upon Wyoming's admission to the Union in 1890. Wyoming Act of Admission, 26 Stat. 664, §§ 4, 5 (Reprinted in Wyo. Stat. Ann. Vol. 1).

[¶ 5] The term of Andersons' lease was to expire at the end of December 1997. As authorized by statute, they submitted a renewal lease application to the Office of State Lands and Investments, the statutory administrator of the land, proposing an annual lease rate of $4,586.40. There were two competing lease offers for the same parcel; one proposed a lower rate than the Andersons but William H. Riedel, the Andersons' neighbor, proposed to pay an annual rate of $6,000 for the same section.

[¶ 6] Wyo. Stat. Ann. § 36–5–105 provides that the holder of an expiring lease shall have a preferential right to renew that lease if the holder meets any competing bid for the subject parcel. Andersons met the Riedel bid of $6,000 per year and, on January 16, 1998, the interim director of the Office of State Lands and Investments awarded the lease to the Andersons for a ten-year term at $6,000 per year.

[¶ 7] Riedel filed an administrative appeal of the interim director's award to the Andersons. The Board of Land Commissioners conducted a hearing and upheld the interim director's decision by letter dated May 6, 1998. Riedel then brought a petition for judicial review of the Board's decision in the district court, challenging the constitutionality of the preference statute. On certification to this Court, the petition was dismissed on the grounds that the Court lacked jurisdiction to review the constitutionality of a statute upon petition for judicial review of an administrative action. *In re Conflicting Lease Application for Lease No. 1–7027*, 972 P.2d 586 (Wyo.1999).

[¶ 8] Riedel then instituted a declaratory judgment case in June 1999 against the Board of Land Commissioners and its members, challenging the constitutionality of Wyo. Stat. Ann. §§ 36–5–101 and 36–5–105, the preferential right-to-renew statute. On July 10, 2000, the district court granted a motion to intervene filed jointly by the Wyoming Stock Growers Association and the Wyoming Wool Growers Association ("the Associations") and a separate motion to intervene filed by the Wyoming Farm Bureau Federation ("the Federation").

[¶ 9] Before trial, the district court asked the parties to brief the legal issue of whether the conveyance of the school lands to the State of Wyoming by the United States imposed a trust on those lands. After briefing, the district court on October 29, 2001, issued an order concluding that the lands were in-

deed encumbered by a trust, imposing on the State a fiduciary duty to manage the lands exclusively for the beneficiaries, the State's common schools.

[¶ 10] Following the district court's trust ruling, the matter was tried to the court in November 2001 on the issue of whether the right-to-renew statute conflicts with the State's trust duties and is therefore unconstitutional. Riedel's case consisted of testimony by himself; Jim Whalen, Assistant Director of the Department of State Lands and Investments; and Dr. Mark Sunderman, a professor at the University of Wyoming and author of several publications on the state school lands. After plaintiff rested, the district court granted the intervenor Associations' motion to dismiss on the grounds that Riedel failed to present adequate evidence that the preferential right to renew violates the State's fiduciary responsibilities. Riedel timely appealed the dismissal of his complaint (Case No. 02–60), and the Associations cross-appealed the trial court's order that the school lands are held in trust (Case No. 02–61). For purposes of this consolidated appeal, Riedel was designated the appellant, while the Associations, the Federation and the State were designated appellees.

*Historical Background*

[¶ 11] Beginning with the admission of Ohio to the United States in 1803, Congress granted to almost all newly admitted states[1] sections of public land for the support of schools. *See, e.g.,* Ohio Enabling Act, 2 Stat. 173, 175 (1802); Wade R. Budge, *Changing the Focus: Managing State Trust Lands in the Twenty–First Century,* 19 J. Land, Resources, & Envtl. L. 223, 226 (1999). The specific language of the grants varied somewhat among the early states' enabling laws, but generally was "for the use of schools" with no mention of trusts, fiduciary obligations, or restrictions on the sale, lease or other use of the lands. *See,* Sally K. Fairfax, et al., *The School Trust Lands: A Fresh Look at Conventional Wisdom,* 22 Envtl. L. 797, 810 (1992). Substantially the same pat-

tern was used for land grants in the admission of Louisiana, Indiana, Mississippi, Illinois, Alabama, Missouri and Arkansas. *See,* Budge, *supra,* at 226. Courts have consistently ruled that Congress had not encumbered these early land grants with a common law trust, but had merely entered into a "solemn agreement" with the states that the land would be used as intended. *See, e.g., Branson Sch. Dist. Re–82 v. Romer,* 161 F.3d 619, 633 (10th Cir.1998) (citing *Alabama v. Schmidt,* 232 U.S. 168, 173–74, 34 S.Ct. 301, 58 L.Ed. 555 (1914), and *Cooper v. Roberts,* 59 U.S. (18 How.) 173, 181–82, 15 L.Ed. 338 (1855)).

[¶ 12] However, beginning with Michigan in 1837, a pattern evolved by which the states through their own constitutions imposed restrictions on the use of the land or its sale proceeds. For example, the Michigan Constitution included a provision requiring that the proceeds from the sale of school lands be put into a permanent fund, a pattern that almost all subsequently-admitted states followed in accepting the terms of their enabling acts. Budge, *supra,* at 227.

[¶ 13] With the admission of Colorado in 1876, Congress began to include in the states' enabling acts some of the same restrictions on the use of the school lands that prior states had constitutionally imposed upon themselves. The Colorado Enabling Act, Ch. 139, § 14, 18 Stat. 474, 476 (1875), provided "[t]hat the two sections of land in each township herein granted for the support of common schools shall be disposed of only at public sale and at a price not less than two dollars and fifty cents per acre, the proceeds to constitute a permanent school-fund, the interest of which to be expended in the support of the common schools." *See also Branson Sch. Dist.,* 161 F.3d at 634.

[¶ 14] The Wyoming Act of Admission granted sections 16 and 36 of every township to the state "for support of common schools" and further provided:

All lands herein granted for educational purposes shall be disposed of only at public sale, the proceeds to constitute a perma-

---

**1.** The exceptions were Maine and West Virginia, which were created from pre-existing states rather than federal land, and Texas and Hawaii, which formerly were independent nations and not created from federal territory. *Budge, supra,* at 226.

nent school fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulations as the legislature shall prescribe, be leased for mineral, grazing, agricultural, or other purposes, provided that the term of agricultural and grazing leases shall not exceed 10 years;[2] and such land shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only.

26 Stat. 222, Ch. 664, § 5. These provisions are nearly identical to those of the Colorado Enabling Act, except that the Wyoming Act of Admission states no minimum purchase price for the school lands.

[¶ 15] The most restrictive of the state enabling acts was the Arizona–New Mexico Enabling Act at the end of the accession period in 1912. That act stated expressly that the lands granted to the state are held "in trust"; provided that the products and proceeds of the lands "shall be subject to the same trusts as the lands"; prescribed the manner of advertising, selling and leasing the lands; directed the method of maintaining and investing the permanent fund; voided any transaction not in conformity with the enabling act; and directed the Attorney General of the United States to enforce all provisions related to the trust lands. Arizona–New Mexico Enabling Act, 36 Stat. 557, 561–568 (June 20, 1910). In *Ervien v. United States*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919), and *Lassen v. Arizona Highway Department*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967), the Supreme Court ruled that the Congress had the power to and did in fact convey the school lands in those states subject to an express trust, such that trust funds could not be used to advertise the states resources nor could the state obtain highway easements over trust lands without compensating the trust.

[¶ 16] It is clear that Wyoming's admission, both chronologically and conceptually, falls somewhere between Congress' *laissez faire* approach to the states admitted in the

early nineteenth century and the closely regulated express trust conveyances to New Mexico and Arizona in 1912. The Wyoming Constitution, adopted before the passage of the Act of Admission, addresses the federally granted lands in several of its provisions:

Art. 7, § 2. School revenues:

The following are declared to be perpetual funds for school purposes, of which the annual income only can be appropriated, to-wit: ... all moneys arising from the sale or lease of sections number sixteen and thirty-six in each township in the state, and the land selected or that may be selected in lieu thereof; ...

Art. 7, § 6. State to keep school funds; investment:

All funds belonging to the state for public school purposes, the interest and income of which only are to be used, shall be deemed trust funds in the care of the state, which shall keep them for the exclusive benefit of the public schools, and shall make good any losses that may in any manner occur, so that the same shall remain forever inviolate and undiminished....

Art. 7, § 7. Application of school funds:

The income arising from the funds mentioned in the preceding section, together with all the rents of the unsold school lands and such other means as the legislature may provide, shall be exclusively applied to the support of free schools in every county in the state.

Art. 18, § 1. Acceptance of lands from United States; sale of such lands:

The State of Wyoming hereby agrees to accept the grants of lands heretofore made, or that may hereafter be made by the United States to the state, for educational purposes ... with the conditions and limitations that may be imposed by the act or acts of congress, making such grants or donations. Such lands shall be disposed

---

**2.** The maximum lease term was amended from five to ten years in 1934. 48 Stat. 350–351 (February 15, 1934); 1935 Wyo. Sess. Laws, ch. 34.

of only at public auction to the highest responsible bidder, after having been duly appraised by the land commissioners, at not less than three-fourths the appraised value thereof, and for not less than $10 per acre; . . .

Art. 18, § 2. Application of proceeds of sale or rental:

The proceeds from the sale and rental of all lands and other property donated, granted or received, or that may hereafter be donated, granted or received, from the United States or any other source, shall be inviolably appropriated and applied to the specific purposes specified in the original grant or gifts.

Art. 18, § 3. Board of land commissioners:

The governor, secretary of state, state treasurer, state auditor and superintendent of public instruction shall constitute a board of land commissioners, which under direction of the legislature as limited by this constitution, shall have direction, control, leasing and disposal of lands of the state granted, or which may be hereafter granted for the support and benefit of public schools, subject to the further limitations that the sale of all lands shall be at public auction, after such delay (not less than the time fixed by congress) in portions at proper intervals of time, and at such minimum prices (not less than the minimum fixed by congress) as to realize the largest possible proceeds . . . .

1891 Wyo. Sess. Laws.

[¶ 17] After the admission of Colorado in 1876, the next states admitted were North Dakota, South Dakota, Montana and Washington in 1889. The delegates to Wyoming's constitutional convention in September 1889 borrowed substantial sections of Wyoming's Constitution from these other states, completing the draft in less than one month. Robert B. Keiter & Tim Newcomb, *The Wyoming State Constitution: A Reference Guide* 1, 4 (1993). The Colorado Constitution at Art. IX, § 10 (1876), the Washington Constitution at Art. XVI, § 1 (1889), the Idaho Constitution at Art. IX, § 8 (1889), and the South Dakota Constitution at Art. VIII, § 7

(1889) each expressly provided that the states' school lands were "held in trust." After Wyoming's admission, the Oklahoma Constitution at Art. XI, § 1 (1907) likewise declared that the lands and proceeds were "a sacred trust." Wyoming's Constitution is significant by contrast in not following these contemporary examples but following other states that declare a trust in the sale proceeds but not in the lands themselves. *See, e.g.*, Mich. Const. Art. X, § 2 (1836).

### DISCUSSION

I. Plaintiff's Standing

[¶ 18] The State and the Wyoming Farm Bureau Federation assert that Riedel does not have standing to assert the unconstitutionality of the state's preferential right of renewal statute. We stated recently that "[s]tanding is a legal concept designed to determine whether a party is sufficiently affected to insure that the court is presented with a justiciable controversy." *Jolley v. State Loan and Inv. Bd.*, 2002 WY 7, ¶ 6, 38 P.3d 1073, ¶ 6 (Wyo.2002).

"The doctrine of standing is a jurisprudential rule of jurisdictional magnitude. At its most elementary level, the standing doctrine holds that a decision-making body should refrain from considering issues in which the litigants have little or no interest in vigorously advocating. Accordingly, the doctrine of standing focuses upon whether a litigant is properly situated to assert an issue for judicial or quasi-judicial determination. A litigant is said to have standing when he has a 'personal stake in the outcome of the controversy.' This personal stake requirement has been described in Wyoming as a 'tangible interest' at stake. The tangible interest requirement guarantees that a litigant is sufficiently interested in a case to present a justiciable controversy."

*Id.* (quoting *Roe v. Board of County Commissioners, Campbell County*, 997 P.2d 1021, 1022–23 (Wyo.2000)). *Jolley* involved a newspaper publisher's petition for review under the Wyoming Administrative Procedure Act to challenge the sufficiency of public meetings conducted by the State Loan and

Investment Board. We concluded that the effect of the Board's decision on petitioner, whose interest in the meetings was as a reporter and citizen, was speculative and did not render him "an aggrieved or adversely affected person" under the Administrative Procedure Act and that he therefore had no standing to appeal the Board's scheduling decision. *Id.* at ¶ 8.

[¶ 19] We generally do not relax the standing requirement in the context of an action under the Uniform Declaratory Judgments Act, but require:

1. The parties must have existing and genuine, as distinguished from theoretical, rights or interests.

2. The controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion.

3. It must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or wanting these qualities to be of such great and overriding public moment as to constitute the legal equivalent of all of them.

4. The proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues.

*State v. Pacificorp*, 872 P.2d 1163, 1168 (Wyo.1994).

[¶ 20] The gravamen of Riedel's constitutional challenge is that the preferential renewal scheme discourages competitive bidding for school lands, limits the funds available to the permanent school fund, and therefore violates the State's fiduciary obligation to maximize revenues from the school lands for its beneficiaries. The State and Federation correctly point out that under the statute the incumbent lessee must meet the highest competing bid in order to exercise the renewal preference. They further argue that any alleged diminution in revenue would constitute injury to the State's common schools and its students, not to Riedel personally, so that there is no causal connection between the alleged unconstitutionality and any injury to Riedel. *See Branson Sch. Dist.*, 161 F.3d at 630–31.

[¶ 21] However, although Riedel may not have clearly articulated a concrete and personal injury, it is implicit in the relief he seeks, namely, that the Board be enjoined from enforcing the preferential renewal statute and that they be ordered to award the lease to him. The statute has clearly worked to deprive Riedel of a lease to the subject school lands, an injury much more direct and personal to him than that at stake in *Jolley*.

[¶ 22] Moreover, we have recognized a relaxed standing requirement in matters of great public interest or importance. We reviewed in detail the development of that doctrine in *Jolley*, ¶ 9. As recited there, we have applied the great public interest doctrine when a constitutional question is presented or where there is an issue concerning apportionment of state revenues among governmental entities. We have invoked the doctrine in cases involving the constitutionality of school financing, *Washakie Cty. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 317 (Wyo.1980); the tax exempt status of a public hospital, *Memorial Hosp. of Laramie Cty. v. Dep't of Revenue and Taxation*, 770 P.2d 223 (Wyo.1989); the constitutionality of the Wyoming Professional Review Panel Act, *State ex rel. Wyo. Ass'n of Consulting Eng'rs and Land Surveyors v. Sullivan*, 798 P.2d 826, 828–29 (Wyo.1990); the entitlement of a school district to interest on school district funds held by the county treasurer, *Bd. of Cty. Comm'rs v. Laramie Cty. Sch. Dist. No. One*, 884 P.2d 946, 949–50 (Wyo.1994); and the constitutional scope of the governor's veto power, *Management Council of the Wyo. Legislature v. Geringer*, 953 P.2d 839, 841–42 (Wyo.1998).

[¶ 23] We conclude that the constitutional challenge to the statute at issue here requires that we decide the status of the state's obligations with regard to the large inventory of state school lands. This is a matter of public importance comparable to the significant issues in the above cases that will affect

not only the preferential right to renew statute but could inform all of the Board's management decisions with regard to those lands while potentially affecting a major source of school funding. For these reasons it is appropriate that we invoke the great public interest exception to the standing requirement in this case.

## II. The Status of School Lands in Wyoming

[¶ 24] Turning to the main issue, we must first decide whether the Wyoming Act of Admission creates a trust obligation with regard to the State's ownership of those lands. As recited above, each state's admission to the Union was a unique situation, negotiated between Congress and the respective territories. There was an evolution in the various states' enabling acts passed by Congress, as well as an evolution in the terms of the states' acceptance of admission.

[¶ 25] At one extreme, the United States Supreme Court has ruled that the relatively unrestricted grants to Michigan and Alabama did not create a federal trust as to the school lands but merely a "solemn agreement" that the lands would be used for the purposes recited. *Papasan v. Allain*, 478 U.S. 265, 289–90 n. 18, 106 S.Ct. 2932, 2947 n. 18, 92 L.Ed.2d 209 (1986); *see also Schmidt*, 232 U.S. at 173–74, 34 S.Ct. at 302; *Cooper*, 59 U.S. (18 How.) at 181–82. At the other extreme, the Supreme Court has ruled that the more restricted land grants to New Mexico and Arizona imposed fiduciary obligations, equivalent to a federally-imposed trust, to manage the lands for the exclusive benefit of the common schools. *Lassen*, 385 U.S. at 467–68, 87 S.Ct. at 588–89; *Ervien*, 251 U.S. at 48, 40 S.Ct. at 76.

[¶ 26] The United States Court of Appeals for the 10th Circuit has noted that "the question of whether a statehood statute creates a federal trust requires a case-specific analysis of the particular state's enabling statute because the history of each state's admission to the Union is unique." *Branson Sch. Dist.*, 161 F.3d at 633. Observing that the Colorado Enabling Act falls somewhere in between—in both chronology and specificity—the Michigan–Alabama model and the Arizona–New Mexico model, the court ruled that the Colorado act contains a sufficient enumeration of duties to indicate Congress's intent to create a fiduciary relationship between the state and its common schools. *Id.* at 633–34. The court also found significant the fact that the Colorado Constitution, adopted immediately after the Enabling Act and therefore a contemporaneous expression of the parties' intent, clearly indicated that the land grants "shall be ... held in trust subject to disposal, for the use and benefit of the respective objects for which said grants of land were made. *Id.* at 634–35.

[¶ 27] Two years later, the 10th Circuit Court of Appeals reviewed the 1896 Utah Enabling Act's grant of land for a miners' hospital for disabled miners. *Dist. 22 United Mine Workers v. Utah*, 229 F.3d 982 (10th Cir.2000). Noting *Branson's* requirement of a case-specific review, the court ruled that Utah's enabling act did not create a trust because the Utah legislature was authorized to dispose of the lands "in such manner as the legislature may provide," and "this express latitude given to the State of Utah militates against the creation of a trust." *Id.* at 990. The 10th Circuit's ruling was in accord with *Andrus v. Utah*, 446 U.S. 500, 507, 100 S.Ct. 1803, 1807, 64 L.Ed.2d 458 (1980), which held that the Utah Enabling Act created a "solemn agreement" by the state to use its school lands as intended by the federal government, but did not create a trust.

[¶ 28] Wyoming's enabling act is similar to Colorado's but differs in two significant respects. The Wyoming act does not specify a minimum sales price for its school lands and expressly authorizes the leasing of the lands in any manner the state legislature provides. Colo. Enabling Act, § 14, 18 Stat. at 476; Wyo. Act of Admission, § 5, 26 Stat. at 22–23. Wyoming's enabling legislation is therefore more in accord with that of Utah, and we therefore conclude that the latitude given the Wyoming legislature likewise militates against the creation of an express trust by the Wyoming Act of Admission.

[¶ 29] Turning to the question of whether the Wyoming Constitution creates an express trust of the school lands, we conclude that it does not. The parties cite authority from

several states for the proposition that the state constitution, either alone or in concert with the states' enabling acts, creates an express trust in accepting the land grants from Congress. Each of those state constitutions is distinguishable from Wyoming's, however. The Colorado Constitution, as noted by the *Branson* court, directs its legislature to "provide by law that the several grants of land ... shall be ... carefully preserved and held in trust ...." 1876 Colo. Const., Art. IX, § 10 (amended 1996); *Branson Sch. Dist.*, 161 F.3d at 635. The South Dakota Constitution likewise provides that "all lands and the proceeds" from such lands are considered perpetual funds, S. Dak. Const., Art. VIII, § 7, which the South Dakota Supreme Court interpreted as creating an express trust in *Kanaly v. State*, 368 N.W.2d 819, 823 (S.D.1985). The Oklahoma Constitution recites that that state accepts all grants of land "as a sacred trust." Okla. Const., Art. XI, § 1; *see also* §§ 2, 5. The Utah Constitution states that the lands "shall be held in trust for the people, ... for the respective purposes for which they have been or may be granted, donated, devised or otherwise acquired. Utah Const., Art. XX, § 1.

[¶ 30]  Although Wyoming's Constitution contains a declaration of trust as to the proceeds from the sale of the lands, Wyo. Const. Art. 7, §§ 2, 6, there is no similar declaration as to the land itself as in the states listed above. The delegates would have had available to them the specific trust language of constitutions such as Colorado's, Oklahoma's, Idaho's and Washington's. It is also significant to note in this regard that the Wyoming Constitution, drafted in September 1889 and adopted by vote of the territorial citizenry in November 1889, was available for review by Congress when it passed the Wyoming Act of Admission in July of 1890. Just as it was significant to the *Branson* court that Colorado, immediately after passage of the Colorado Enabling Act, declared in its constitution that the lands were held in trust, so it is significant that Congress passed the Wyoming Enabling Act knowing that the new Wyoming Constitution limited the declaration of trust to proceeds from the sale of the lands.

[¶ 31]  The State in its brief cites *National Parks & Cons. Ass'n v. Bd. of State Lands*, 869 P.2d 909 (Utah 1993), for the proposition that it is irrational to distinguish between the lands and the proceeds of those lands as the corpus of a constitutionally declared trust. However, although such a distinction is not an uncommon one in state constitutions, Utah is the only state to so rule and, in fact, the only state to address the issue. According to one commentator, "the issue of whether the school lands are a part of the same trust that applies to the permanent fund remains an open question that a state legislature could answer." Sean E. O'Day, *School Trust Lands: The Land Manager's Dilemma Between Educational Funding and Environmental Conservation, A Hobson's Choice?*, 8 N.Y.U. Envtl. L.J. 163, 210 (1999); *see also*, Fairfax, *supra*, at 826.

[¶ 32]  A summary of the Wyoming Constitution's provisions regarding the state school lands shows that the lands are accepted for educational purposes; that the board of land commissioners is established with authority to manage, sell or lease the lands as directed by the legislature; that the proceeds from the sale and lease of the lands shall constitute a permanent trust fund, with only the income used for educational purposes; that the lands may be leased on whatever terms the legislature shall prescribe; and that the lands may be sold only at public auction for at least three-quarters of their appraised value. We conclude that the express latitude given the legislature, combined with the limitation of the express trust language to the *proceeds* from the lands, militate against a constitutionally-created trust in the school lands by the terms of the Wyoming Constitution.

[¶ 33]  Although neither the Wyoming Act of Admission nor the Wyoming Constitution encumber the school land grants with a trust, the legislature's wide management authority over those lands includes the authority to statutorily declare a trust. Wyo. Stat. Ann. § 36–5–101, et seq. (LexisNexis 2001) (regulating leases of school land grants). In 1996 the legislature commissioned a study of the school lands, *see*, "Final Report and Recommendations of the Select Committee on State

Trust Lands," (Wyo.Leg.Serv.Office, Nov. 15, 1996), which resulted in substantial amendment of the leasing statutes during the 1997 session. While the state land grants may have heretofore been informally referred to as "trust lands," the 1997 act included the following statement of principles:

(a) The legislature endorses the following statements of principle and directs that the board of land commissioners and the director of state lands abide by these statements in the implementation of these statutes:

(i) The state land trust, consisting of trust lands, trust minerals and permanent land funds shall be managed under a total asset management policy;

(ii) The state land trust is intergenerational. Therefore, the focus is on protecting the corpus for the long term;

(iii) Trust land should remain a substantial, integral component of the state land trust portfolio. There is no mandate to sell any trust asset to maximize revenue in the short term;

(iv) All leases of trust land shall assure a return of at least fair market value considering the management practices and risk assumed by the lessee when determining fair market value;

(v) Investment policies shall ensure that the earning power of the permanent land fund is not reduced from the effect of inflation.

1997 Wyo. Sess. Laws ch. 200, § 3. Section § 36–5–105, amended in the same 1997 Act, directs that the state school lands shall be leased "in such manner and to such parties as shall inure to the greatest benefit to the state land trust beneficiaries." *Id.*, § 1.

[¶ 34] The use of such explicit trust language in the declaration of principles and the statute clearly indicates the legislature's intention that the land grant be subject to a trust and administered according to the prescribed guidelines. The Association correctly points out in its brief that the referenced language first appeared in 1997, apparently for the proposition that the right to renew takes historical precedence over a later statutory trust. However, because we find it is within the legislature's authority to declare a trust in the school lands, that authority could be exercised at any time, and the chronology of that exercise is not significant in this case, nor is it necessary for us to decide if a statutory trust existed before 1997. It is sufficient to note that the legislature has now declared a trust. It is also not necessary for us to decide whether this Court's use of trust language in *Frolander v. Ilsley,* 72 Wyo. 342, 264 P.2d 790 (1953), decided the issue or was dicta that merely used a colloquial expression to describe the school lands.

III. Constitutionality of Lease Preference

■ [¶ 35] Given our conclusion that the school lands in Wyoming are subject to a statutory trust, we must address the parameters of that fiduciary obligation. Riedel and the State, citing *Lassen* and *Ervien,* argue that there is a fiduciary obligation to maximize revenues from the trust lands, and Riedel argues that the right-to-renew statute depresses the market for leasing school lands. Those cases, however, were interpreting the 1912 Arizona–New Mexico Enabling Act, which does include a express federal trust and is very different from the Wyoming Act of Admission. The *Branson* decision informs us that, even if there is a federal trust, it does not necessarily carry with it a common law duty to maximize revenue from the trust corpus and the state may define the fiduciary duty within the bounds of the federal trust. *Branson Sch. Dist.,* 161 F.3d at 638–39. Since we hold that the land trust in Wyoming is a creature of statute, we agree with the Association that the statutes incorporate all of the trustee's duties, and that such arrangement is authorized by the Act of Admission and the Constitution's express authorization to lease the lands "under such regulations as the legislature shall prescribe." It is not necessary, and indeed would be inappropriate, to look to other states or common law trust principles to define the state's fiduciary obligations with regard to the school land's *statutory* trust.

■ [¶ 36] The current version of the preferential right to renew was enacted in 1997 in the same legislative act as the declaration of trust. We construe statutes in ac-

cord with the ordinary and obvious meaning of their language to determine the legislature's intent. *Thunderbasin Land & Livestock v. Laramie Cty.*, 5 P.3d 774, 779 (Wyo. 2000). If the language is sufficiently clear, we need not resort to other rules of construction. *Id.*

[¶ 37] We will discuss each of Riedel's constitutional objections. He first claims that the preferential right to renew "violates Wyoming's fiduciary trust obligation to receive fair market value for agricultural leases of the common school land grants." He distinguishes the earlier cases in which we upheld similar preference laws on the grounds that those cases turned on statutory interpretation and refers us instead to *Lassen v. Arizona ex rel. Arizona Highway Dep't.* As discussed above, however, at issue in *Lassen* was the uniquely specific Arizona–New Mexico Enabling Act. And since we conclude that any trust in Wyoming is a creation of Wyoming statute, that trust does not carry with it the duty to maximize revenues found by the *Lassen* court. Plaintiff's first constitutional challenge therefore fails.

[¶ 38] Riedel next argues that the preferential right-to-renew is tantamount to an absolute right of renewal, violating the enabling act's ten-year limit on leasing, and that in depressing lease values it grants privileges to incumbent lease holders over the trust beneficiaries. Riedel's arguments in this regard are speculative, as was his statistical evidence at trial in which he attempted to show that the vast majority of leases are renewed by the incumbent lease holders. He does not nearly approach his heavy burden to "clearly and exactly show the unconstitutionality beyond a reasonable doubt." *Reiter v. State*, 36 P.3d 586, 589 (Wyo.2001). We have ruled that prior preferential right to renew leases are conditional, not absolute. *Frolander*, 72 Wyo. at 364–65, 264 P.2d at 799; *Kerrigan v. Miller*, 53 Wyo. 441, 448, 84 P.2d 724, 726 (1938); *Mercer v. Thorley*, 48 Wyo. 141, 150, 43 P.2d 692, 695 (1935). The current statutory right is even more conditional: the incumbent must re-apply every ten years, must have met prior lease payments, must otherwise maintain eligibility, and most im-portantly must match any higher bid offered for the same land. The State may still decide to sell the land or not to lease it at all; if it does lease, it does so at the highest rate bid by anyone. We therefore find that the conditional right to renew does not violate the enabling act's prohibition of leases longer than ten years.

[¶ 39] Riedel next argues that the preferential right-to-renew statute violates the requirement that the school lands be disposed of by public auction, as required by Wyo. Const, Art. 18, § 1. We agree with the Association and the State that the relevant constitutional provision, requiring that "disposal" of the lands be at public auction, is clear and unambiguous. To **"dispose of"** means "to alienate, relinquish, part with, or get rid of." Black's Law Dictionary 471 (6th ed.1990). As with statutes, we interpret the Constitution according to its plain and obvious meaning. *Amoco Production Co. v. Hakala*, 644 P.2d 785, 789 (Wyo.1982). The framers clearly did not consider a lease to be a sale when they granted to the Board of Land Commissioners the "direction, control, leasing and disposal" of the state lands. Wyo. Const., Art. 18, § 3. We held in *Ross v. Trustees of Univ. of Wyo.*, 30 Wyo. 433, 443, 222 P. 3, 7 (1924), that the granting of a right-of-way across state lands is not a "disposal" as contemplated by the Constitution. We conclude likewise that a lease of state lands as authorized by the Constitution is not a disposal of those lands and need not be accomplished by public auction.

[¶ 40] Riedel contends that the preferential right to renew violates the constitutional prohibition on "granting any privileges to persons who may have settled upon any of the school lands . . ., by which the amount to be derived by the sale or other disposition of such lands, shall be diminished directly or indirectly." Wyo. Const., Art. 18, § 5. This argument lacks cogency: the lessees of today are not the original settlers contemplated by the Constitution and, as noted above, the leasing of the lands is not a "sale or other disposition" of the school lands.

[¶ 41] Riedel's final constitutional argument is the one addressed by most of his

evidence at trial. Assuming the existence of a trust, and assuming the trust to be governed by common law standards rather than the legislature, he contends that the right to renew depresses the value of agricultural leases and therefore violates the trustees duty to maximize revenue from the trust lands. However, we have concluded that the land trust in Wyoming is created by the legislature and hence the management of that trust and, as specifically authorized by the Constitution, the leasing of the trust lands, are governed by the statutes and not by common law trust principles. *Huckfeldt v. State Bd. of Sch. Land Comm'rs,* 20 Wyo. 162, 122 P. 94 (Wyo.1912). The legislature will not be presumed to have created the trust and violated it at the same time.

[¶ 42] The trial court granted judgment as a matter of law at the close of plaintiff's case. A review of the record shows that judgment was properly granted. Riedel sought to prove through expert testimony that incumbent lease holders in Wyoming almost always prevail when there is a competing lease application, that those leases have a positive "permit value" when agricultural properties are marketed, and that other states realize more for their leases because they have a variable rather than a single statewide minimum lease rate. Much of his evidence was of a historical nature, and addressed past management practices of the Board without tie-in to the current statute or the lease at issue. To conclude from that evidence that the state is not realizing sufficient income from its trust lands, rising to the level of a breach of fiduciary duty, would be sheer speculation and falls far short of Riedel's considerable burden to prove the statute's unconstitutionality. While there may have been problems with earlier versions of the preferential right to renew statute, the current version requires that the renewing lease holder match any competing bid and therefore approximates market value. Riedel's evidence that many private agricultural sales include a premium for the seller's lease permits, in addition to being substantially impeached, does not necessarily indicate that the lease was undervalued when granted by the Board. It is just as likely that the lease premium recognizes the sell-

er's efforts in obtaining the lease or improvements made to the leasehold.

## CONCLUSION

[¶ 43] The lands granted to the State of Wyoming by Congress upon the State's admission were not conveyed subject to a federal trust, nor did the people of Wyoming constitutionally impose a trust on those lands. However, the Legislature has appropriately exercised its authority under the Act of Admission and Constitution to declare those lands subject to a trust. The legislature, concurrently with the establishment of that trust, provided that incumbent lease holders of the state lands would have a preference in renewing their lease. Riedel failed to prove that such preference violates any fiduciary or constitutional constraints on the State's management of the trust lands, and the district court's grant of defendants' motion to dismiss is therefore affirmed.