652 So.2d 1 (1994)
STATE of Louisiana, ex rel. PLAQUEMINES PARISH SCHOOL BOARD
v.
PLAQUEMINES PARISH GOVERNMENT.
No. 93-CA-2339.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1994.
Opinion Supplementing Decision on Grant of Partial Rehearing April 7, 1995.
Mack E. Barham, Robert E. Arceneaux, Kathy S. Austin, Barham & Arceneaux, New Orleans, Richard P. Ieyoub, Atty. Gen., Gary L. Keyser, Asst. Atty. Gen., David C. Kimmel, Asst. Atty. Gen., Baton Rouge, Jack Pierce Brook, Jan T. Van Loon, David M. Latham, Brook, Morial, Cassibry, Pizza, & Van Loon, New Orleans, for appellant.
Before BYRNES, CIACCIO, WARD, WALTZER and LANDRIEU, JJ.
WALTZER, Judge.
This is an appeal from an August 16, 1993 judgment of the 25th Judicial Court providing as follows:
IT IS ORDERED, ADJUDGED AND DECREED, as follows:
1. The exception of prescription filed on behalf of Plaquemines Parish Government is found to be contrary to the law and the evidence and is hereby denied.
2. The motions arguing the defenses of laches and estoppel are moot considering the court's ruling on the exception of no right of action, infra.
3. The sixteenth sections in the townships located in the Parish of Plaquemines, State *2 of Louisiana, and more particularly located and described as follows:
1) T19 S, R18 E.
2) T20 S, R19 E.
3) T18 S, R25 E.
4) T19 S, R26 E.
5) T20 S, R26 E.
6) T20 S, R27 E.
7) T21 S, R26 E.
8) T21 S, R27 E.
9) T21 S, R29 E.
10) T21 S, R30 E.
11) T22 S, R30 E.
12) T22 S, R31 E.
13) T23 S, R31 E.
are subject to the school trust reserved by the United States.
4. The plaintiff, Plaquemines Parish School Board, is not the proper party to bring this lawsuit and the exception of no right of action is hereby maintained.
5. Each party to bear their own costs.
From this judgment, both parties appeal.
Plaintiff-appellant, the State of Louisiana ex rel Plaquemines Parish School Board
(hereinafter, the "School Board"), raises the following specifications of error:
1. Does a school board possess a right of action to bring suit in the name of the State to recover lands allegedly disposed of in violation of the school lands trust?
2. Does a trust exist over Sixteenth Section lands such that any donation of these lands by the state for non-school purposes is illegal and null?
3. Does a grant of lands by the State which only generally describes lands, and does not expressly state that the Sixteenth sections are included, constitute a conveyance of Sixteenth Section lands?
4. Can the State lose title to Sixteenth Section lands through prescription, laches or estoppel?
5. Are Sixteenth Section lands that are also "sovereignty lands" subject to the school land trust?
Defendant-appellant, the Plaquemines Parish Government (hereinafter, "P.P.G."), raises essentially the same specifications of error phrased as follows:
1. Does the trust reserved by law for the benefit of public schools apply to all sections sixteen, including sovereignty lands, regardless of the physical or legal characteristics of the lands, or does it merely apply to those public lands which the United States held by derivative title?
2. Is an action brought by a local School Board to declare certain conveyances null and void asserted some thirty-five years after the date of the last conveyance subject to liberative prescription?
3. Does the School Board have a right of action under LSA-R.S. 41:961 et seq. to recover lands to which the State has legally conveyed title?
Lest future readers wonder why two governmental subdivisions have engaged in such protracted and vigorous litigation over property located in isolated swampy areas, the true treasure at issue is the right to receive present and future mineral royalties from various mineral leases in conjunction therewith. The School Board has stipulated that it is not claiming past mineral lease payments, but rather it is only seeking present and future payments from the date the suit was filed. The parties have further stipulated that none of the leases will be disturbed or challenged, the only issue being who has the right to receive the funds generated from those leases.

HISTORICAL DISCUSSION
In 1785, the Continental Congress set aside Sixteenth Section lands for the exclusive use of public education (1 Stat. 563). In 1789, Article IV Section 3 Clause 2 of the United States Constitution was adopted providing that "... Congress shall have the power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States ..." (emphasis added). On May 18, 1796, Congress passed the act creating a rectangular survey system (1 Stat. 464). On April 30, 1803, France sold the Louisiana territory to the United States upon execution *3 of the Treaty of Cession. The reservation of Sixteenth Section lands attached to the Louisiana territory at this point. On April 21, 1806, Congress authorized the President of the United States to sell lands within the Louisiana territory, subject to a reservation of Sixteenth Section lands for public education purposes, specifically stating that the Sixteenth Section "shall be reserved in each township for the support of the schools within the same" (2 Stat. 391). On March 3, 1811, Congress again authorized the President of the United States to sell further lands within the Louisiana territory, again subject to a reservation of Sixteenth Section lands for public education purposes, specifically stating that the Sixteenth Section "shall be reserved in each township for the support of the schools within the same" (2 Stat. 662). The Louisiana territory was admitted to the United States by three Congressional Acts, to-wit: 2 Stat. 641 of February 20, 1811, 2 Stat. 701 of April 8, 1812, and 2 Stat. 708 of April 14, 1812. When Louisiana entered the union, under the equal footing doctrine, its navigable waterbottoms were reserved unto itself, thus it owned its waterbottoms of navigable bodies of water. On March 2, 1849, Congress passed the Swamp and Overflowed Lands Act which gave swamp lands to the state. Congress had to pass legislation to give swamp lands to the states because the states did not already own them as navigable waterbottoms, because swamps and tidal overflow lands were presumed not to be navigable. Hence, swamplands were not state lands under the equal footing doctrine.

SPECIFICATION OF ERROR ONE
The School Board argues that the trial court erred in maintaining the exception of no right of action and in finding that it was not the proper party to bring this lawsuit. We agree.
Public Lands, Ch. 6 Part IV. entitled "ACTIONS INVOLVING SCHOOL LANDS" Subpart A. entitled "Actions by the State" includes the following statutes:
The Attorney General may contract with and employ attorneys at law to sue for and recover from any person, firm or corporation, claiming under color of title, sixteenth sections known as school lands, title to which belongs to the State of Louisiana, and to sue for and recover damages for trespass upon sixteenth sections known as school lands except where the school boards have sold the timber thereon, whether the trespasser claims under color of title or not. LSA-R.S. 41:921
In all cases suit shall be brought for and in the name of the State of Louisiana. LSA-R.S. 41:923
The authority given by this Sub-part shall apply to all sixteenth sections donated by the Congress of the United States to the State of Louisiana in trust for public school purposes, and to which the state has never legally parted with the title. LSA-R.S. 41:924
All moneys recovered for the state shall, after deducting and paying the attorneys' fees, and all other lawful costs and charges, be paid into the state treasury, to be kept on the books of the State Auditor and the State Treasurer, to the credit of the township in which the land is situated, in the same manner as now provided by law for the proceeds of the sale of sixteenth sections. LSA-R.S. 41:925
In the instant case, the Attorney General, the School Board and hired counsel all signed the employment contract. In addition, the suit was titled "State of Louisiana ex rel Plaquemines Parish School Board", thus suit was brought in the name of the State. Additionally, the following Motion to Enroll as Co-Counsel dated November 28, 1989, was filed by the Attorney General's Office[1]:
On Motion of State of Louisiana, appearing through William J. Guste, Jr., Attorney General and the undersigned Assistant Attorneys General, and on suggestion to the court that Assistant Attorney General S. Dwayne Broussard has been assigned the task of assisting Assistant Attorney General Gary L. Keyser, Chief, Lands and Natural *4 Resources Division, Department of Justice, in representing the State in the above captioned matter and that therefore the said S. Dwayne Broussard should be enrolled as co-counsel for the State of Louisiana;
IT IS HEREBY ORDERED that Assistant Attorney General S. Dwayne Broussard be and hereby is enrolled as co-counsel for the State of Louisiana in this action.
The Motion to Enroll contained the following signature line:
Respectfully submitted,
WILLIAM J. GUSTE, JR.
Attorney General
GARY L. KEYSER
Assistant Attorney General
S. DWAYNE BROUSSARD
Assistant Attorney General
We find that the school board was authorized both by statute and by written authorization by the Attorney General to bring this suit. Accordingly, we find that the trial court erred in granting the exception of no right of action and reverse that part of the judgment.
Turning to the second specification of error, the existence of a school trust has long been established in both Louisiana and Federal jurisprudence and it has been consistently held that the school trust lands can be alienated only where it is of benefit to school in some manner such as payment of the sale or lease price to the school fund or school board. In the instant case, no funds were given to the school fund or school boards or their predecessors.
In Andrus v. Utah, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980), the United States Supreme Court stated:
When the first 13 States formed the Union, each State had sovereign authority over the lands within its borders. These lands provided a tax base for the support of education and other governmental functions. When settlers sought to carve the State of Ohio from the Northwest Territory in 1802, they encountered a different situation. Vast tracts within the boundaries of the proposed State belonged to the Federal Government. Thus, the new State's potential revenue base would be restricted severely unless the Federal Government waived its immunity from taxation. In order to place Ohio on an equal footing with the original States, Congress enacted a compromise drawn from the Land Ordinance of 1785 and the Northwest Ordinance of 1787. The compromise set a pattern followed in the admission of virtually every other State. Specific details varied from State to State, but the basic plan persisted. As consideration for each new State's pledge not to tax federal lands, Congress granted the State a fixed proportion of the lands within its border for the support of public education. (citations omitted)

These agreements were solemn bilateral compacts between each State and the Federal Government ... For its part, the Government granted the State specific sections of land within each township laid out by federal survey. The granted sections were specified by number to ensure that the State would receive a random cross section of the public land ... Congress also imposed upon the State a binding and perpetual obligation to use the granted lands for the support of public education. All revenue from the sale or lease of the school grants was impressed with a trust in favor of the public schools. No State could divert school lands to other public uses without compensating the trust for the full market value of the interest taken. (At 1814-1815) (emphasis added).
In the instant case, the State diverted the school lands to another public purpose, levee protection, without compensating the trust for the full market value of the land and mineral leases thereon.
We further note that the transfers from the State to the Levee District did not constitute transfers to a third-party for purposes of LSA-R.S. 41:924. The Levee Board is an administrative subpart of the state and the transfers were not transfers of title, but merely transfers of administration and custody without ownership from one administrative sub-part of the state to another administrative *5 sub-part of the state. The transfers to the Levee Districts were subject to the Sixteenth Section trust and the Levee Boards accepted the lands subject to the Sixteenth Section trusts.
In State v. Humble Oil and Refining Co., 195 La. 457, 197 So. 140 (La.1940), the Louisiana Supreme Court held that passage of the legislation creating the State Mineral Board did not divest parish school boards of their ownership and rights to lease sixteenth section lands and the State Mineral Board had no power to do so absent an express legislative statement, which was not made in the subject legislation.
In Humble, supra, the school board granted a mineral lease on the sixteenth section property in 1934 to Sidney W. Sweeney, who assigned the lease to Humble. In 1938, while the Sweeney lease was still in effect, the school board granted a second mineral lease on the same sixteenth section property to John B. Daigle, who assigned the lease to Humble. On the basis of the second lease, Humble stopped paying on the first lease and allowed it to lapse. Sweeney's position was then argued by the State Mineral Board who argued that the second lease was invalid because in between the two leases the legislature had taken the authority to handle mineral rights of sixteenth sections lands from the school boards and given it to the State Mineral Board. The Supreme Court did not agree, stating:
The history of the sixteenth section lands reveals that the Federal Government set aside and dedicated them for the use of public education, and it was not until many years after this State was admitted into the Union that the title to the lands was finally determined. If it be conceded that the title to these sixteenth sections is in the State, there is a moral, if not a clear legal obligation, resting upon the State to dedicate the revenues derived from such lands to public education. The framers of the various State Constitutions have clearly recognized the State's moral obligation and have embodied in the various constitutions provisions dealing with sixteenth sections, expressly dedication of the revenues from those sections to public education. At a number of sessions of the legislature, statutes have been enacted providing for the sale, leasing and operation of the sixteenth sections. From the first constitutional or legislative pronouncement up to and including the legislative session of 1934, sixteenth sections have been continuously recognized as school lands, and as such, separate and distinct from other kinds of public lands.... it is clear that Act 93 of 1936 and Act 80 of 1938, which in terms authorize the State Mineral Board to lease for mineral purposes "any lands belonging to the State or the title to which is in the public, including rights of way, road-beds, lake and river beds and other bottoms, lands adjudicated to the State at tax sale, and any other lands and water bottoms by whatever title acquired" is not a special but is a general law.
For more than one hundred years it has been the settled policy of this State, as reflected in various constitutional and statutory provisions, to treat sixteenth section lands as separate and distinct from all other State lands and to place them under the control of the school authorities. Had the legislature, in adopting the Mineral Board acts, intended to change this well recognized policy and to vest jurisdiction of those lands in the Mineral Board, it is unlikely that it would have left open for construction its intention to do so. The Constitution provided that revenues derived from sixteenth section lands shall be segregated and dedicated to the use of the public schools. There is no provision either in Act 93 of 1936 or Act 80 of 1938, for the segregation and dedication of such revenues, and in order to hold that the effect of the acts is to repeal Section 30 of Act 100 of 1922, the Court would of necessity have to hold, also, that certain provisions of the repealing acts are unconstitutional. It would seem to be obvious that before the legislature intended to make such a drastic change in public policy, a change which would have the effect of placing school lands in the same class as other public lands and to vest the control of such lands in the Mineral Board, the legislature, in compliance with the mandate of the Constitution, would have provided the revenues *6 derived from the sixteenth section lands should be segregated and used solely for school purposes.
Act 93 of 1936 and Act 80 of 1938 are general statutes prescribing the manner by which public lands belonging to the State may be leased for the production of oil, gas and other minerals. It is clear that the purpose of the act is to secure for the State greater returns from the mineral development of the public lands. As we have hereinabove observed, the sixteenth section lands have been set apart as school lands and have been dealt with as such for many years. They have been excluded ex industria from all legislation covering or relating to public lands. Their status as school lands was not affected by any previous legislative act dealing with the leasing of public lands for mineral purposes. Prior to the institution of this suit, the right of a school board to control and administer, for the benefit of the public schools, the sixteenth section lands situated in its parish was never questioned ... the legislature was excessively careful to describe certain kinds of lands that were included in the grant to the State Mineral Board. If it were the intention of the legislature that sixteenth section lands, which were under the jurisdiction of the school authorities, should be amenable to the provisions of the act, it would have been a simple matter for the legislature to also mention those lands in the statutory provisions ... The omission is significant and can not lead the earnest inquirer to any other conclusion than that the omission was intentional and that it was never within the contemplation of the legislature to divest the school boards of their control and administration of the sixteenth section lands ... The legislature has never granted the Register any authority over the sixteenth section lands, and it is clear that the Register is not in a position to furnish the (Mineral) Board with any information concerning those lands. (At 143-4).

* * * * * *
The State Constitution, Sections 14 and 15 of Article 12, specifically and in terms, requires that the proceeds from the sale or lease of sixteenth section lands shall constitute part of the school funds and that those funds must be segregated and kept in separate bank accounts under the control of the parish school boards. Since it can not be presumed that the legislature would violate a constitutional mandate by misappropriating school funds, it would seem to be clear that the legislature did not intend to do so by enacting the Mineral Board acts. (At 145).
For the reasons discussed, the judgment of the district court granting the exception of no right of action finding the Plaquemines Parish School Board is not the proper party to bring suit is reversed. The judgment denying the exception of prescription is affirmed. The judgment finding moot the defenses of laches and estoppel is affirmed, subject to the following holding:
Those lands that were not beds of navigable waters on April 30, 1812 and were surveyed as 16th Section lands are subject to the school trust. The Plaquemines Parish School Board is entitled to all revenue from these lands from the date suit was filed.
Those lands that were beds of navigable waters on April 30, 1812 form no part of the 16th Section in which they are located (or would be located if the 16th Section was a surveyed whole Section), and are sovereignty lands not impressed with the school trust.
Those lands that were beds of navigable waters on April 30, 1812 that are now land areas and are no longer lands under navigable bodies of water are still sovereignty lands and are not impressed with the school trust.
The case is remanded to the trial court for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

ON REHEARING
We grant partial rehearing in this matter to consider for the first time the status of those lands that are subject to the ebb and flow of the tides as well as those lands that form the bottoms of unnavigable rivers and streams. Accordingly, we amend our original *7 opinion to provide the following supplement.
Those lands, whether surveyed or unsurveyed, that were subject to the ebb and flow of the tides of the Gulf of Mexico on April 12, 1812, belong to the State by virtue of its sovereignty and are not subject to the school trust. Those lands that form the bottoms of unnavigable rivers and streams, but are not tidelands, are subject to the school trust.
BYRNES, Judge, concurring with reasons.
Terrebonne Parish School Bd. for Use and Benefit of Public Schools of Terrebonne Parish v. Texaco, Inc., 178 So.2d 428 (La.App. 1 Cir.1965), writ refused 248 La. 465, 179 So.2d 640 (1965), cert. den. 384 U.S. 950, 86 S.Ct. 1568, 16 L.Ed.2d 546 (1966), holds that the beds of navigable waters are "held by the State of Louisiana by virtue of its sovereignty" and are not subject to the 16th section school trust. On the other hand the sui generis history of Louisiana's admission into the Union permits a technical argument to be made for subjecting such lands to the 16th section school trust. But it is unlikely that it was ever intended to impress the 16th section school trust on the beds of navigable waters, and it is even less likely that anyone adverted to Louisiana's unique history or contemplated that an exception be made for navigable waters in Louisiana. This is supported by the fact that Federal survey law does not contemplate the survey of sections, including 16th sections, in navigable waters. Borax Consolidated v. City of Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935).
However, the holding in Borax, is based on the premise that the beds of navigable waters are sovereignty lands and are not surveyable for that reason. If one accepts the argument that 16th section lands were dedicated to schools prior to 1812 while Louisiana was still a territory, then Borax loses its persuasive force. Additionally, when the Terrebonne court traced the history of Louisiana's admission into the Union, it failed to consider whether the title to 16th section lands that would fall into the beds of navigable waters could have been impressed with the school trust while Louisiana was still a territory. That argument was never brought up.
For this Court to follow Terrebonne and Borax is the course least likely to do mischief to established land titles. However, as this case decides issues that could impact land titles throughout Louisiana; as the impact of this decision on education may be significant; and as the authorities upon which it relies are persuasive, but not controlling; therefore, I would commend this matter to our Supreme Court for a definitive disposition.
For the foregoing reasons, I find that tidelands and the beds of navigable waters are not subject to the 16th section school trust.
MURRAY, J. concurs for reasons assigned by BYRNES, J.
WALTZER, Judge dissenting with reasons.
The United States acquired land which became territories and then states in many different ways. Much of the land acquired was uninhabited at the time of its acquisition. Unlike the experience of many other states, Louisiana was inhabited and already had private property titles in position at the time of its acquisition. In 1750, a little over twentyfive years before the American Revolution and before the United States even existed, there were people in Louisiana holding title to property and a legal system already in operation. The people of Louisiana owned land under Spanish and French law. On November 3, 1762 Louisiana was transferred from France to Spain by the Treaty of Fountainebleau. In 1776, the American Revolution occurred, giving rise to the Articles of Confederation and then to the Constitution. In 1785, the Continental Congress set aside Sixteenth Section lands for the exclusive use of public education (1 Stat. 563). In 1789, Article IV Section 3 Clause 2 of the U.S. Constitution was adopted giving Congress the power not only to dispose of, but also to regulate the territories. On October 1, 1800 Spain transferred Louisiana back to France by the Treaty of St. Ildefonso. Meanwhile in France, the Civil Code was voted in 36 separate laws, which were put into force one after the other from March 1803 to March, *8 1804. They were afterwards put together into a single code of 2281 articles under the name "Civil Code of the French," by a law of 30 Ventose, Year XII (21 March 1804). On April 30, 1803 France sold Louisiana to the United States by the Treaty of Paris. Upon transfer, if Louisiana had a written body of law, then the United States would take subject to that law, which would remain in effect. If, however, there was no written body of law, then the general common law would become the controlling law of the land. Although the Civil Code of the French, was binding upon Louisiana, there was not a copy in the possession of anyone in the colony at that time. Accordingly, the redactors, using a draft copy of the French Code and a copy of the Projet du Gouvernement (1800), hurriedly reduced to writing their understanding of the Code combined with the Spanish and French law under which Louisiana operated. The Projet provided that "(Things) belong: Either to the nation (Louisiana) as a body, or to public institutions, or to communes, or to individuals." Book II, Title I, Art. 2. The Treaty of Paris ceded to the United States, not all land, but rather all the public and unappropriated lands within the territory. Congress regulated the territory of Louisiana by reserving 16th Section lands for public education on April 21, 1806. 2 Stat. 391. Thus the reservation of 16th Section lands for public education occurred while Louisiana was a territory and before it ever became a state. The Digest of the Civil Laws of the Territory of Orleans 1808 provided:
Art. 1. The word estate in general, is applicable to anything in which the riches or fortunes of citizens may consist. This word is likewise relative to the word thing which is the second object of jurisprudence whose rules are applicable to persons, things and actions.
Art. 2. Things are either common or public, they either belong to corporations, or they are the property of each individual.
Art. 3. Things which are common are those whose property belongs to nobody, and which all men may freely use, conformably to the use for which nature has intended them, such are air, running water, the sea and its shores.
Art. 4. By sea shore, we understand the space of land upon which the waters of the sea, are spread in the highest water, during the winter season.
Art. 5. From the public use of the sea shores, it follows that every one has a right to build there a cabin, to retire to, and likewise to land there, either to fish or to shelter themselves from the storm, to moor ships, to dry nets, and the like, provided, no damage arise from the same to the buildings or monuments erected by the owners of the adjoining property.
Art. 6. Public things are those the property of which belongs to a whole nation, and the use of which is allowed to all the members of the nation: Of this kind, are navigable rivers, sea ports, roads, harbours, high ways, and the bed of rivers as long as the same is covered with water. (Underline added).
Hence it follows that every man has a right freely to fish in the rivers, ports, roads and harbours.
Art. 7. In the number of public things are likewise reckoned such as are for the common use of the inhabitants of a city, or of another place, and on which individuals cannot exercise any right of property, such as the walls; the ditches, the gates, the streets, and the public squares of a city.
Art. 8. The use of the shores of navigable rivers or creeks, is public; accordingly every one has a right freely to bring his ships to land there, to make fast the same to the trees which are there planted, to unload his vessels, to deposit his goods, to dry his nets, and the like.
Nevertheless the property of the river shores belong to those who possess the adjoining lands.
The Louisiana territory was admitted to the United States by three Congressional Acts, to-wit: 2 Stat. 641 of February 20, 1811, 2 Stat. 701 of April 8, 1812, and 2 Stat. 708 of April 14, 1812.
When the thirteen colonies joined together to form the United States, they did not grant to the Union their source of commercetheir navigable waterways. Obviously, non-navigable waterways were not highways of commerce *9 by the mere fact that they were not navigable. In order to allow later States to enter with the same advantages as the original 13 Colonies, the "equal footing" doctrine was developed to provide that later states entered the union on equal footing with the original colonies. When Louisiana entered the Union, its navigable waterbottoms, i.e. its highways of commerce, were reserved unto itself, thus it owned its waterbottoms of navigable bodies of water. Sovereignty lands by definition are navigable waterbottoms not granted to the Union by a state. This is all that "sovereignty lands" means. To find that non-navigable waterbottoms or tidelands are "sovereignty lands" is a contradiction in terms.
On March 2, 1849, Congress passed the Swamp and Overflowed Lands Act which gave swamp lands to the state. Congress had to pass legislation to give swamp lands to the states because the states did not already own them as navigable waterbottoms, because swamps and tidal overflow lands were presumed not to be navigable. Hence, swamplands and tidal lands were not state sovereignty lands under the equal footing doctrine.
As Yiannopoulos states[1]:
Swamp lands acquired by Louisiana from the United States and state owned bottoms of inland non-navigable water bodies are private things. The state acquired the ownership of the beds or bottoms of all inland navigable waters upon its admission into the Union in 1812. Such water bodies that continue to be navigable are public things: however, if they cease to be navigable they become private things of the state. It may thus be important to determine whether a body of water was navigable in 1812 and whether or not it continues to be navigable. Navigability is ordinarily a question of fact; if a body of water is navigable in fact, it is navigable in law. In order to be navigable, bodies of water must be used, or be susceptible of being used, "in their ordinary condition, as highways of commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."
In footnote 18, he further states:
All courts have consistently held that the beds of nonnavigable bayous and streams belong to the riparian owners. (Citations omitted).
Accordingly, rehearing should not be granted to enlarge the definition of sovereignty lands to include nonnavigable waterbottoms and swamps, also called tidelands. However, rehearing should be granted to review the main holding, namely that where a land or a waterbottom is both sovereignty land (i.e. navigable waterbottom on April 30, 1812) and a 16th Section land, which primes? The majority holds that the sovereignty land primes, I would hold that the 16th section primes, because the 16th section attached in 1806 when Louisiana was a territory, prior to its admission as a State in 1812.
Lastly, I note that in Phillips Petroleum Company v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988), the United States Supreme Court specifically looked to and applied Mississippi state law in reaching its decision and acknowledged that the outcome for other states would not necessarily be the same, based upon the application of that state's law. As the Louisiana Law Institute concluded in "Phillips Petroleum Co. v. Mississippi: The Louisiana State Law Institute's Advisory Opinion Relative to Non-Navigable Waterbottoms", 53 La.L.Rev. 35, 73 (1992):
... it follows that with respect to "Phillips Lands" (i.e. lands not covered by navigable waters including the sea and its shore but which are lands subject to being covered by water from the influence of the tide), which previously have been alienated by the state under laws existing at the time of such alienation, the U.S. Supreme Court's Phillips decision does not reinvest the State of Louisiana with any ownership of such lands, i.e. by the Phillips decision, the State of Louisiana has not acquired any new ownership of property which the *10 state disposed of under laws applicable at the time of disposition.
NOTES
[1] The record in this matter was designated on appeal, thus we do not have the entire record before us. The Motion to Enroll contained in the record that we have is an unsigned photocopy, however, all parties admitted at oral argument that the trial court judge signed the original.
[1] Louisiana Civil Law Treatise: Property Yiannopoulos (West, 1991) Section 61.