STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

03-765

EROLL EBEY, ET AL

VERSUS

AVOYELLES PARISH SCHOOL BOARD AND
STATE OF LOUISIANA

**************

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, DOCKET NUMBER 2002-4078-A
HONORABLE MARK A. JEANSONNE, PRESIDING

*************

SYLVIA R. COOKS
JUDGE
*************

Court composed of Ned E. Doucet, Chief Judge, Sylvia R. Cooks, and Michael G. Sullivan, Judges.

**AFFIRMED.**

Rodney M. Rabalais
P.O. Box 447
Marksville, Louisiana 71351
COUNSEL FOR APPELLANT:
    Errol Ebey

James T. Lee
P.O. Box 1021
Bunkie, Louisiana 71322
COUNSEL FOR APPELLEE:
    Avoyelles Parish School Board

Burton P. Guidry
P.O. Box 94005
Baton Rouge, Louisiana 70804-9005
COUNSEL FOR APPELLEE:
    State of Louisiana

**COOKS, Judge.**

## STATEMENT OF THE CASE

This case involves a dispute over the management of approximately thirty-six hundred acres of timbered school property located in Avoyelles Parish. Plaintiff, Errol Ebey, a parent of school-age children, objects to the way the property is currently being managed by the Avoyelles Parish School Board (School Board). Particularly, Mr. Ebey's petition alleges the School Board has allowed school lands to be used for free recreational purposes, primarily hunting and fishing, when the leasing of the lands to private or public entities (ie., timber companies/private hunting clubs) at public bid would "maximize income and obtain full market value from the resources on the school lands."

Mr. Ebey premises his cause of action on Congressional statutes admitting Louisiana into the United States (the Enabling Acts), the Louisiana Trust Code and Louisiana Revised Statutes. Alternatively, Mr. Ebey relies on Louisiana Civil Code articles governing a *stipulation pour autri.* Mr. Ebey contends the transfer from Congress to Louisiana, with the stipulation that the lands be used for the support of public education, created a trust; the State of Louisiana is the trustee of Section 16 lands; the Avoyelles Parish School Board is the designated administrator of the trust lands through legislative act; and the school children are the beneficiaries of the trust. Mr. Ebey contends the current management policies of the State of Louisiana (the State) and the School Board violate the trust principles established by these provisions.

We have examined the facts alleged in Mr. Ebey's petition, with attached documents, and conclude Mr. Ebey has stated no facts to support a cause of action against the State of Louisiana or the Avoyelles Parish School Board for violating the directives of the Enabling Act and Louisiana Revised Statutes which govern the

2

management of school lands nor do we find Mr. Ebey states a cause of action under the provisions of the Louisiana Trust Code, or the Louisiana Civil Code articles governing a *stipulation pour autri*. Therefore, for the reasons assigned below, we affirm the decision of the trial court.

## LAW AND DISCUSSION

*Exception of No Right of Action*

The School Board filed an Exception of No Right of Action, alleging Mr. Ebey has no standing to pursue a claim against the School Board. The trial court found Mr. Ebey, as a parent of children currently attending school in Avoyelles Parish, has standing to pursue a grievance against the School Board. We find no error in this decision.

*Exception of No Cause of Action*

The School Board filed an Exception of No Cause of Action. The School Board characterizes Mr. Ebey's suit as a Writ of Mandamus to compel the School Board to lease the land to private hunting clubs and timber companies. The School Board contends these duties are non-mandatory, discretionary duties and a writ of mandamus will not lie to compel performance of these duties. La.Code Civ.P. art. 3863 and 3864. *Citizens Organized for Sensible Taxation (C.O.S.T.) v. St. Landry Parish Sch. Bd.*, et al., 528 So. 2d 1048 (La.App. 3 Cir. 1988). The trial court treated Mr. Ebey's suit as a Writ of Mandamus and dismissed the petition on a No Cause of Action exception. We will review Mr. Ebey's petition as one in ordinary process to determine whether he has stated a cause of action.

A peremptory exception of no cause of action presents a question of law which an appellate court will review de novo. *Hawkins v. Evangeline Bank & Trust Co.*, 01-1292 (La.App. 3 Cir. 2/06/02), 817 So.2d 141 *writ denied*, 02-658 (La. 5/24/02), 816 So.2d 308. No evidence may be introduced to support or controvert the exception.

3

Rather, the exception is tried on the face of the petition, with supporting documentation. For the purposes of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. La.Code Civ.P. art. 931; *Hawkins*, 817 So.2d 141; *City of New Orleans v. Bd. of Comm'rs*, 93-690 (La. 7/5/94), 640 So.2d 237. This exception is designed to test the legal sufficiency of the petition to determine whether the plaintiff is afforded a remedy in law based on the facts alleged in the petition. *Everything on Wheels Subaru, Inc. v. Subaru South Inc.*, 616 So.2d 1234 (La.1993); *Hawkins,* 817 So.2d 141. In order to determine whether the Plaintiff has stated a cause of action, we must examine the legal principles on which he relies.

*History of Trust Doctrine over Section 16 Lands in Louisiana*

We accept as true the allegations of Mr. Ebey's petition that the State of Louisiana has recognized Section 16 lands are held in trust for the benefit of public education. However, as the School Board notes, the language of the Enabling Act does not mention a "trust." Rather, it provides that Section 16 lands are "reserved in each township for the support of schools within the same . . ." (Ninth Congress Sess. I CH 39 1806). An early Louisiana case, *State v. Humble Oil & Refining Co.*, 195 La. 457, 197 So. 140 (La.1940), speaks only in terms of a "moral" obligation by the State:

> The history of the sixteenth sections lands reveals that the Federal Government set aside and dedicated them for the use of public education, and it was not until many years after this State was admitted into the Union that the title to the lands was finally determined. If it be conceded that the title to these sixteenth section is in the State, there is a moral, if not a clear legal obligation, resting upon the State to dedicate the revenues derived from such lands to public education. . . .
>
> . . . .
> For more than one hundred years it has been the settled policy of this State, as reflected in various constitutional and statutory provisions, to treat sixteenth section lands as separate and distinct from all other

4

State lands and to place them under the control of the school authorities.

*Id*. at 143, 144.

*State ex rel. Plaquemines Parish School Board v. Plaquemines Parish Government*, 93-2339 (La.App. 4 Cir. 12/15/94), 652 So.2d 1, *writ denied*, 95-1049 (La. 6/23/95), 656 So.2d 1015 provides an historical background:

> In 1785, the Continental Congress set aside Sixteenth Section lands for the exclusive use of public education (1 Stat. 563). In 1789, Article IV Section 3 Clause 2 of the United States Constitution was adopted providing that ". . . Congress shall have the power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . ." (emphasis added). On May 18, 1796, Congress passed the act creating a rectangular survey system (1 Stat. 464). On April 30, 1803, France sold the Louisiana territory to the United States upon execution of the Treaty of Cession. The reservation of Sixteenth Section lands attached to the Louisiana territory at this point. On April 21, 1806, Congress authorized the President of the United States to sell lands within the Louisiana territory, subject to a reservation of Sixteenth Section lands for public education purposes, specifically stating that the Sixteenth Section "shall be reserved in each township for the support of the schools within the same" (2 Stat. 391). On March 3, 1811, Congress again authorized the President of the United States to sell further lands within the Louisiana territory, again subject to a reservation of Sixteenth Section lands for public education purposes, specifically stating that the Sixteenth Section "shall be reserved in each township for the support of the schools within the same" (2 Stat. 662). The Louisiana territory was admitted to the United States by three Congressional Acts, to-wit: 2 Stat. 641 of February 20, 1811, 2 Stat. 701 of April 8, 1812, and 2 Stat. 708 of April 14, 1812.

*Id.* at. 2-3.

Nowhere in any of these grants was the word "trust" or "trustee relationship" used. However, various states, including Louisiana, began using trust language in statutes regulating the use of Section 16 lands. *Riedel v. Anderson* 70 P.3d 223 (Wy. 2003) discusses the evolution in the use of trust language in the various state constitutions and statutes including Louisiana.

> The specific language of the grants varied somewhat among the early states' enabling laws, but generally was "for the use of schools" with no mention of trusts, fiduciary obligations, or restrictions on the sale, lease, or other use of the lands. *See,* Sally K. Fairfax, et al., *The School Trust*

5

*Lands: A Fresh Look at Conventional Wisdom*, 22 Envtl. L. 797, 810 (1992). Substantially the same pattern was used for land grants in the admission of Louisiana, Indiana, Mississippi, Illinois, Alabama, Missouri and Arkansas, See, Budge, supra, at 226. Courts have consistently ruled that Congress had not encumbered these early land grants with a common law trust, but had merely entered into a "solemn agreement" with the states that the lands would be used as intended. See, e.g., *Branson Sch. Dist. Re-82 v. Romer*, 161 F.3d 619, 633 (10th Cir. 1998)(citing *Alabama v. Schmidt*, 232 U.S. 168, 173-74, 34 S.Ct.301, 58 L.Ed. 555 (1914), and *Cooper v. Roberts*, 59 U.S. (18 How.) 173, 181-82, 15 L.Ed. 338 (1855).

> However, beginning with Michigan in 1837, a pattern evolved by which the states through their own constitution imposed restrictions on the use of the land or its sale proceeds. . . .

> With the admission of Colorado in 1876, Congress began to include in the states' enabling acts some of the same restrictions on the use of the school lands that prior states had constitutionally imposed upon themselves.

*Id*. at 227 (footnote omitted).

The concept that Section 16 lands are held by Louisiana in trust was recognized in *State ex rel. Plaquemines Parish School Board,* 652 So.2d 1, where in the court stated:

> [T]he existence of a school trust has long been established in both Louisiana and Federal jurisprudence and it has been consistently held that the school trust lands can be alienated only where it is of benefit to school in some manner such as payment of the sale or lease price to the school fund or school board.

*Id.* at 4.

In so holding, the *Plaquemines* court cited the United States Supreme Court case of *Andrus v. Utah*, 446 U.S. 500, 100 S.Ct. 1803(1980) in which the Court stated:

> Congress also imposed upon the States a binding perpetual obligation to use the granted lands for the support of public education. All revenues from the sale or lease of the school grants was impressed with a trust in favor of the public schools. No State could divert school lands to other public uses without compensating the trust for the full market value of the interest taken.

*Id*. at 1814-15(emphasis deleted).

Regardless of whether the Enabling Act intended to create a common law trust over Section 16 lands in Louisiana, the concept of a trust has been written into

Louisiana statutes and recognized by the courts. *State ex rel. Plaquemines Parish Sch. Bd.,* 652 So.2d 1; *City of Baker Sch. Bd. v. East Baton Rouge Parish Sch. Bd.,* 99-2505 (La.App. 1 Cir. 2/18/00), 754 So.2d 291.

La.R.S. 41:98(A) provides in relevant part:

[Lands] granted, appropriated, or reserved by Congress in trust to the state of Louisiana, for school purposes.

La.R.S. 41:642(A) provides in relevant part:

The trustee title of the State of Louisiana to those 16th Section or indemnity lands granted by Congress to the State of Louisiana as trustee for the benefit of school children. . . .

The management of these trust lands is vested by the State in the local school boards. *See* La.R.S. 17:100.6 and La.R.S. 41:638. In *City of Baker School Board,* 754 So.2d at 293, the court stated:

> Public education is a function of the sovereign. La.Const. art. 8, § 1; *see also Terrebonne Parish School Board v. St. Mary Parish School Board*, 131 So.2d 266, 270 (La.App. 1 Cir. 1961). School boards perform the function of the sovereign implementing the constitutional mandate to provide public schools and to administer public education. *Shaw v. Caddo Parish School Board*, 347 So.2d 39,41 (La. App. 2 Cir.) writ denied, 350 So.2d 676 (1977). School boards are agencies of the state. *Rousselle v. Plaquemines Parish School Board*, 93-1916, p. 6 (La. 2/28/94), 633 So.2d 1235, 1241. The task of educating the children of Louisiana rests with the individual school boards throughout the state. See *Drouin v. Board of Directors of Public Schools of Parish of Avoyelles,* 136 La. 393, 398, 67 So. 191, 192 (1915). The ownership, management and control of property within a school board's district is vested in the district, in the manner of a statutory trustee, for the accomplishment of its duty. *See Orleans Parish School Board v. City of New Orleans*, 56 So.2d 280, 284 (La.App. Orleans 1952). The general rule of ownership of property of school districts was stated in 68 Am.Jur.2d, *Schools* §74 (1993), as follows:
>
>> The ownership of school property is generally in the local district or school board as trustee for the public at large. School property is thus considered public property and is not to be regarded as the private property of the school district by which it is held or in which it is located [footnotes omitted].

In *State v. Humble Oil & Refining Co.*, 195 La. 457, 197 So. 140 (La. 1940), the

court stated that "the right of a school board to control and administer, for the benefit of the public schools, the sixteenth section lands situated in its parish was never questioned. " *Id*. at 144.

We conclude Section 16 lands are held in trust by the State and managed by school boards "in the manner of a statutory trustee" for the benefit of public education. The School Board "shall have the right to administer and use the property for public school purposes," subject to statutory regulations regarding its sale or lease. La.R.S. 41:638; La.R.S. 41:631 et seq.

The management of Section 16 lands is but one aspect of the power of the school board. As a creature of the legislature, the school board is entrusted with the administration of the public schools, including the right to budget funds, promulgate rules for the hiring of personnel, establish the curriculum and formulate policies affecting every aspect of the school system. La.R.S. 17:51; La.R.S. 17:81 et seq. This power necessarily includes management of all school property, including Section 16 lands. It follows, then, that school board decisions relating to Section 16 lands are to be treated as any other school board decision. Absent "a clear showing of abuse of the authority granted to the board under the statutory law" courts should not interfere in discretionary management decisions of the board. *Earnest v. Caldwell Parish Sch. Bd.*, 368 So.2d 801, 803 (La.App. 2 Cir. 1979). "Any other rule would charge the court with the difficult task of operating the public school system . . . . [and] would result in confusion inimical to the welfare and efficiency of our public school system." *Estay v. Lafourche Parish Sch. Bd.*, 230 So. 2d 443. 449 (La.App. 1 Cir. 1969). In *Louisiana Ass'n of Educators v. Iberia Parish School Board*, 476 So.2d 1086, 1092 (La.App. 3 Cir. 1985), this court held the "budgeting of funds is a matter within the sound discretion of the School Board and absent a clear abuse of its legal authority and discretion, the Court will not interfere with decisions of the School Board."

Mr. Ebey contends the decisions of the School Board with regard to the management of Section 16 lands should be treated differently from other decisions of the School Board. He has not alleged a statutory violation by the School Board, only a breach of the trust obligation. However, even measuring the School Board policy against the general principles of the trust code, we do not find an abuse of the School Board's discretionary authority. Under the general principles of trust, a trustee is required to "administer the trust as a prudent person would administer it. In satisfying this standard, the trustee shall exercise reasonable care and skill, considering the purposes, terms, distribution requirements, and other circumstances of the trust." La.R.S. 9:2090(A). With regard to trust property, La.R.S. 9:2127 provides in relevant part:

> [A] trustee shall invest and manage trust property as a prudent investor. In satisfying this standard, the trustee shall consider the purposes, terms, distribution requirements, and other circumstances of the trust. A trustee's investment and management decisions are to be evaluated in the context of the trust property as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

La.R.S. 9: 2115 provides in relevant part:

> If discretion is conferred upon a trustee with respect to the exercise of a power, its exercise shall not be subject to control by the court, except to prevent an abuse of discretion by a trustee.

Mr. Ebey takes a very restricted view of the choices available to the School Board as a prudent administrator of school lands. Mr. Ebey contends by refusing to lease the property for the harvesting of the timber, the School Board is failing to "maximize income and obtain full market value from the resources on the school lands." The concept that "maximizing income" is the only valid goal in school land management was introduced in *Ervien v. United States*, 25 U.S. 41, 40 S.Ct. 75 (1919) and expanded in *Lassen v. Arizona*, 385 U.S. 458, 87 S.Ct. 584 (1967). These two cases, cited by the Plaintiff, interpreted the provisions of the New Mexico-Arizona

9

Enabling Act.

In *Ervien*, the issue was whether New Mexico could use funds obtained from school lands to advertise New Mexico's amenities for the purpose of enticing new residents. The United States Supreme Court looked to the New Mexico-Arizona Enabling Act and held funds obtained from school lands must be used for educational purposes. To divert the funds to general public use, as New Mexico was proposing, was a breach of trust. In 1967, the United States Supreme Court, in *Lassen,* held the Arizona State Highway Department must compensate the school fund at the full appraised value for use of the land for the construction of a highway. Prior to this decision, the Arizona Highway Department was granted rights-of-way over school trust lands without compensating the school fund for use of the land. The *Lassen* court relied on *Ervien* and the New Mexico-Arizona Enabling Act and concluded "[a]ll these restrictions in combination indicate Congress' concern both that the grants provide the most substantial support possible to the beneficiaries and that only those beneficiaries profit from the trust." *Lassen*, 87 S.Ct. 589.

Although the New Mexico-Arizona Enabling Act was more restrictive than that of the other states, after *Lassen*, "state court decisions universally precluded state land managers from managing for public purposes or for promotion of public policies other than those supporting public education."[1] Subsequent decisions, following *Ervien* and *Lassen*, focused on income maximization to the exclusion of all other concerns.[2] However, in "1980, the California legislature abandoned dominant use philosophies by mandating multiple use for public school lands management, and expressly

---

[1] Sean E. O'Day, *School Trust Lands: The Land Managers's Dilemma Between Educational Funding and Environmental Conservation, A Hobson's Choice?*, 8 N.Y.U Environmental Law Journal, 163, 191 (1999).

[2] *Id.* at p.188.

including conservation and rehabilitation of the lands as recognizable uses."[3]

In 1998, the United States Court of Appeals for the Tenth Circuit, in *Branson School District Re-82 v. Romer,* 161 F.3d 619 (10 Cir. 1998) *cert. denied,* 526 U.S. 1068, 119 S.Ct. 1461, 143 L.Ed.2d 546 (1999), was called upon to test the constitutionality of a school land use amendment to Colorado's Constitution against the provisions of Colorado's Enabling Act. The *Branson* decision represents a more enlightened approach to school land management policies. In *Branson*, school districts and public school students sued to enjoin the implementation of an amendment to the school trust lands article of the Colorado Constitution. The court framed the issue as such: "[W]hether the voters of Colorado may alter the management principles guiding the state's trusteeship of public lands without violating the terms of a century-old trust established by Congress when the state entered the Union." *Id.* at 626. At the core of the dispute was Amendment 16, which deleted the requirement that the Colorado land board manage its holdings "in such a manner as will secure the maximum possible amount" for the public schools. This language was replaced with a directive requiring land managers to "produce reasonable and consistent income over time." The change in language was significant and represented a departure from the rigidity of the "maximum income" standard. Additionally, Amendment 16 included the establishment of a "Stewardship Trust" over several hundred acres of school land. The *Branson* court explained:

> The philosophical heart of Amendment 16–and the provision that seems to have prompted the greatest opposition from the plaintiffs–is the initiative's declaration of a principle of "sound stewardship" which should guide the new State Board of Land Commissioners in its management of the school lands. This provision declares:
>> that the economic productivity of all lands held in public trust is dependent on sound stewardship, including protecting and enhancing the beauty, natural values, open spaces and wildlife habitat thereof, for this and future

---

[3] *Id.* at p.191, fn.170.

11

generations. In recognition of these principles, the board shall be governed by the standards set forth in this section 10 in the discharge of its fiduciary obligations, in addition to other laws generally applicable to trustees.

. . . .

Rather than reading this provision as changing the exclusive purpose of the school lands trust, as the plaintiffs argue, we believe that the "sound stewardship" principle merely announces a new management approach for the land trust. The additional requirement to consider beauty, nature, open space, and wildlife habitat as part of the whole panoply of land management considerations simply indicates a change in the state's chosen mechanism for achieving its continuing obligation to manage the school lands for the support of the common schools. A trustee is expected to use his or her skill and expertise in managing a trust, and it is certainly fairly possible for a trustee to conclude that protecting and enhancing the aesthetic value of a property will increase its long term economic potential and productivity. The trust obligation, after all, is unlimited in time and a long-range vision of how best to preserve the value and productivity of the trust assets may very well include attention to preserving the beauty and natural values of the property.

*Id*. at 638.

*Branson* does not depart from the fundamental principle that funds generated from school lands must be used for the support of public education; rather, *Branson* recognized "beauty, nature, open space, and wildlife habitat" are legitimate goals for determining school land use and in the long term may be "how best to preserve the value and productivity of the trust assets." *Id.*

Likewise, we do not find the School Board may depart from its fundamental responsibility to use funds generated from the sale or lease of school lands for public education. However, we do find the Louisiana Enabling Act and state statutes governing school lands broad enough to allow the State and the School Board a myriad of management choices, which often involve balancing several competing interests, to determine what best suits the particular tract of school land.

12

It is clear Mr. Ebey is aligned with the timber industry[4] and would have the School Board consider only its interests to the exclusion of all other concerns.[5] Mr. Ebey relies on the report of Joel Sanders, a forestry consultant. Mr. Sanders inspected the property for the purpose of assessing standing timber values on the acreage. He estimated the aggregate worth of the standing timber at two million dollars. However, this income could only be realized by a one-time clear-cut of the timber.[6] Mr. Sanders' report does not advocate this action by the School Board. Instead, Mr. Sanders' report advocates select cutting, timber management and, more importantly, addresses the problems associated with harvesting the timber on each tract. With regard to the tract referred to as Sabine Lake, Mr. Sanders' writes:

> The best potential for this tract is recreational lease. On a long term basis this tract probably would not generate very much income from timber production. I think the type of soil has a lot to do with the low productivity of this tract . . . . My recommendation is the timber could be sold if the school board needed to generate some money. This would really be the only reason for doing this because it is small and there is really nothing on this tract that is a favorable species. If the Wildlife wanted to purchase or exchange this property I would let them come up with a more favorable piece of land for an exchange. The reason for this

---

[4] Although Errol Ebey and his children are named plaintiffs, standing in the shadows are private hunting clubs and timber companies who would ultimately benefit financially from a change in School Board policy. See, Ebey Exhibit #3, a letter dated August 26, 2002, from the Paradise Land and Lake, LLC to the Avoyelles Parish School Board which provides: "We understand the School Board is considering leasing Section 16 lands . . . . I have been authorized by our Board of Directors to offer $20.00 per acre, and we are prepared to take possession immediately . . . . We also understand the School Board is considering implementing timber management on Section 16 lands, which may include a select timber cut." The trial judge noted a blind copy of this letter was sent to Mr. Ebey's attorney two months prior to suit being filed.

[5] A letter dated July 29, 2002 from the Avoyelles Wildlife Federation to the Avoyelles Parish School Board reflects the competing interests involved in this land management case: "The Avoyelles Wildlife Federation officers, Board of Directors and many of the sportsmen who use these lands, would agree to support select cutting of the School Board timberlands, providing that these are select cuts, while keeping the best interest of our environmental concerns, wildlife, long term timber management, and that these lands would not be put out for long term leases to private individuals for profit. . . . We feel there is a happy medium that can be reached with all concerned, that would benefit all."

[6] Minutes of the June 17, 2002 meeting of the School Board reflects the following: "Board member John Lemoine referred to a recent article which appeared in The Town Talk concerning cutting of timber on Board owned lands. Mr. Lemoine stated that in order for the Board to generate $2 million, it would be necessary to clear cut the land and as a result there would no longer be any large timber on the lands for another 75-100 years."

is because it is not a high producer of timber it has more of a recreational use and the access is through a private landowner and it is probably three or four miles of private gravel road for the access.

With regard to the Gin Lake tract, Mr. Sanders recommends "to let it grow for another ten years. At this time the portion left on the south end should be of a size that select cut would be beneficial."

Mr. Sanders assessed the standing timber value on the Bayou Cocodrie tract at $250,000. However, he notes the following:

> This tract is cut up in several portions by bayous. It fronts on Little River and has a bayou extending south down into the property and winding through the property. . . . There are a few factors associated with this tract. The main one being access. The way I went into the tract was by a small wooden bridge. I do not know if it would support a loaded log truck. With the bayous located on this property, they divide it into several portions. Access to the east would need to be different from access to the west and I think there is almost an island located in the center of the north end of the property. All of these access problems would need to be resolved before any of the timber could be sold. . . .

Mr. Sanders inspected the Bayou Natchitoches tract, with standing timber valued at $250,000, and found a significant amount of bitter pecan trees, which is "one of the lowest valued species." The bitter pecan trees would have to be removed to allow more valuable trees to grow and mature. He writes:

> My recommendation would be to remove all of the bitter pecan to release the more favorable reproduction underneath. This would remove a lot of the timber value and volume. The cutting rotation between the next timber cutting would be longer on this tract than with other tracts. The reason being the remaining trees would have to grow longer before they are merchantable.

It is apparent from Mr. Sanders' report the School Board has many legitimate concerns regarding the harvesting of the timber, including the effect of harvesting on drainage, the cost of harvesting timber in the low lying areas, the cost of cutting and removing undesirable trees, the cost of stump removal, the effect of large scale tree removal on erosion, the destruction of the aesthetic value and recreational use of the

14

land, wildlife preservation, the cost of building access roads and bridges on the property, and future use of the land.[7] The School Board has requested, on numerous occasions, inspection and recommendation reports on Section 16 lands from the Louisiana Department of Agriculture and Forestry in order to formulate a land management plan. Mr. Ebey's petition and Mr. Sanders' report do not support a finding the School Board's policy of cautious and conservative land management is unreasonable or arbitrary. In fact, just the opposite is shown. The difficulties facing the School Board regarding when and how to harvest the timber efficiently and profitably become very apparent from a reading of Mr. Sanders' report. The School Board must be given the opportunity to make those decisions without judicial interference. We do not find the Enabling Act, Louisiana Revised Statutes or the Louisiana Trust Code mandate an obligation on the part of the State of the School Board to lease school lands to the timber industry when such a course, in the judgment of the School Board, as a prudent administrator, is not in the best interest of the school system.

**CONCLUSION**

We conclude land management decisions of the School Board with regard to Section 16 lands are like any other discretionary school board decision. Courts will not interfere absent a specific violation of a state statute or a clear abuse of discretionary authority.

As a prudent administrator, the School Board is charged with implementing a plan for the trust lands which may legitimately include a concern for clean air and water, species preservation, family recreational activities, as well as providing consistent income for the support of public education. We recognize Avoyelles Parish

---

[7] The record indicates some of the tracts are currently designated as State Wildlife Management Areas.

is a rural area with hunting and fishing a mainstay of family activities and social gatherings. It is the primary obligation of the School Board, within the dictates of state and federal statutes, to use the land to provide income for schools and preserve the trust asset for future generations of children. The conclusory allegations of Mr. Ebey's petition do not state facts to support a breach of that obligation. Therefore, we do not find a cause of action against the State of Louisiana or the Avoyelles Parish School Board under the Enabling Act, Louisiana Revised Statutes or the Louisiana Trust Code. Louisiana Civil Code articles governing a *stipulation pour autri* are not applicable to this dispute.

## DECREE

Based on the foregoing review of the record, we affirm the decision of the trial court. All costs of this appeal are assessed to Mr. Errol Ebey.

**AFFIRMED**.